EMPIRE THEATRE CO., APPELLANT, v. CLOKE ET AL.,
RESPONDENTS.

(No. 3,707.)

(Submitted November 25, 1916.   Decided January 25, 1917.)

[163 Pac. 107.]

*Injunction—Labor Unions—Boycotts—Conspiracy—Constitution—Freedom of Speech—Personal Liberty—Threats—Nuisances—Appeal and Error—Obiter Dictum.*

Appeal and Error—*Obiter Dictum*—Definition.
   1.   An *obiter dictum* is a gratuitous opinion which is binding upon no one.

Injunction—Constitution—Freedom of Speech.
   2.   Since under section 10, Article III, of the state Constitution, one may publish what he pleases, subject only for penalty for abuse of such discretion, he cannot be prevented from doing so by injunction.

Labor Unions—Right to Boycott.
   3.   Labor unions are lawful; they may publish and pursue a peaceful boycott against any person or enterprise deemed by them to be unfriendly, and a combination of such unions or their members cannot be deemed a conspiracy.

   [As to right of nonunion employees to enjoin strike by union co-employees, see note in Ann. Cas. 1913D, 369.]

Same—Boycott—Threats.
   4.   Generally speaking, what one may lawfully do, one may give warning of an intention to do, without being chargeable with making threats.

Same—Boycott—Injunction.
   5.   The action of labor unions in warning the public and persons in sympathy with them, through means of a banner carried upon the streets and immediately in front of the premises of the person against whom they seek to enforce a peaceable boycott, that such person is unfair to organized labor, may not be enjoined as a threat or intimidation to others or a deprivation of personal liberty.

Same—Lawful Combinations—Conspiracy.
   6.   A combination to do a lawful thing by lawful means is not a conspiracy, irrespective of the character, numbers or influence of the members or the consequences which may follow.

Same—Labor Unions—Boycott—Injunction—Nuisances.
   7.   In a suit to enjoin labor unions from conducting a boycott against plaintiff's theater, from picketing the same by men carrying banners and dissuading patrons from entering, findings of the trial court *held* insufficient to warrant the issuance of a writ of injunction on the ground that the acts complained of constituted a nuisance within the meaning of section 6162, Revised Codes.

For authorities passing on the question of constitutional freedom of speech and of the press, see note in 32 L. R. A. 829.

On injunction against publishing or circulating statements relative to industrial disputes by labor unions, see note in 32 L. R. A. (n. s.) 1013.

On law as to picketing, see notes in 4 L. R. A. (n. s.) 302; 50 L. R. A. (n. s.) 412.

*Appeal from District Court, Silver Bow County, in the Second Judicial District; J. M. Clements, a judge of the First District, presiding.*

ACTION by the Empire Theatre Company, a corporation, against Harry Cloke, Silver Bow Trades and Labor Council, and others. From a judgment of dismissal, plaintiff appeals. Affirmed.

*Messrs. Roote & Hopkins, Mr. Enos E. Allen,* and *Mr. William T. Pigott,* of Counsel, submitted a brief; *Mr. Jesse B. Roote* and *Mr. Pigott* argued the cause orally.

Under the equity practice, irrespective of statute, voluntary unincorporated associations of the species to which the Musicians' Union and the Silver. Bow Trades and Labor Council belong, may be sued for injunctive relief; nor is there a doubt that an injunction may properly go against a labor union by name, such injunction being operative to bind all its members who have notice, whether they be named as parties or not. Such was the procedure in *Lindsay & Co. v. Montana Federation of Labor,* 37 Mont. 264, 127 Am. St. Rep. 722, 18 L. R. A. (n. s.) 707, 96 Pac. 127; in *Iverson v. Dilno,* 44 Mont. 270, 119 Pac. 719; in *Rocky Mountain Bell Tel. Co. v. Montana Federation of Labor,* 156 Fed. 809; in *George Jonas Glass Co. v. Glass Bottle Blowers' Assn.,* 77 N. J. Eq. 219, 41 L. R. A. (n. s.) 445, 79 Atl. 262; in *United States v. "Old Settlers,"* 148 U. S. 427, 37 L. Ed. 509, 13 Sup. Ct. Rep. 650; in *Cotter v. Grand Lodge A. O. U. W.,* 23 Mont. 82, 57 Pac. 650; in *Eastern States Retail Lumber Dealers' Assn. v. United States,* 234 U. S. 600, L. R. A. 1915A, 788, 58 L. Ed. 1490, 34 Sup. Ct. Rep. 951; *Parkinson Co. v. Building Trades Council,* 154 Cal. 581, 16 Ann. Cas. 1165, 21 L. R. A. (n. s.) 550, 98 Pac. 1027, and in many other cases; *United States v. Coal Dealers' Assn.,* 85 Fed. 252, is directly in point. If, however, neither of the associations, defendant in the case at bar should have been made a defendant by its common name, no prejudice has resulted or can ensue, for "its members

may be sued, either by joining all of them or one or more for all, where the members are so numerous that it is impracticable to bring them all in, but it is the suit of the members, not of the union.  I have no doubt that an injunction may properly go against a trade union by name, and will operate to restrain all of its members who have knowledge of it.''  (*Allis-Chalmers Co.* v. *Iron Molders' Union*, 150 Fed. 155; see, also, *Consolidated Steel & Wire Co.* v. *Murray*, 80 Fed. 811; *American Steel & W. Co.* v. *Wire Drawers etc. Unions*, 90 Fed. 598; *Gorman* v. *Russell*, 14 Cal. 531; *Meux* v. *Maltby*, 2 Swan. Ch. 277; 36 Eng. Reprint, 621; 30 Cyc. 100.)

We contend that upon principle, as well as upon the authority of cases adjudged by this court, by the supreme court of the United States, and by the highest courts in Great Britain, the record here demands and necessitates that the judgment must be reversed and injunctive relief granted.  Not a case has been found, so far as we know, in which any court of last resort has refused relief upon like facts.  ''If upon these facts, so found, the plaintiff could have no remedy against those who had thus injured him, it could hardly be said that our jurisprudence was that of a civilized community.''  (*Quinn* v. *Leathem* [1901], L. R. App. Cas. 495, 1 B. R. C. 197.)   The injunction would in nowise be opposed to the doctrine declared by way of an *obiter dictum* in *Lindsay & Co.* v. *Montana Federation of Labor*, 37 Mont. 264, 127 Am. St. Rep. 722, 18 L. R. A. (n. s.) 707, 96 Pac. 127, to the effect that section 10 of Article III of the Constitution of Montana inhibits the court from restraining the freedom of speech.  The only cases cited by this court to support its view upon that point were *Dailey* v. *Superior Court*, 112 Cal. 94, 53 Am. St. Rep. 160, 32 L. R. A. 273, 44 Pac. 458, and *Marx & Haas Jeans Clothing Co.* v. *Watson*, 168 Mo. 133, 90 Am. St. Rep. 440, 56 L. R. A. 951, 67 S. W. 391.  The California case was decided in 1896.  The true ground of that decision and its limited scope are evidenced by *Goldberg, Bowen & Co.* v. *Stablemen's Union*, 149 Cal. 429, 117 Am. St. Rep. 145, 9 Ann. Cas. 1219, 8 L. R. A. (n. s.) 460, 86 Pac. 806, decided more than ten years later.   The

court there amended the decree awarding the injunction by excising so much of it as restrained defendants "from the mere expressions of an opinion at any time or place as to plaintiff and its business, which would, at the worst, consist only of slander, which could not be reached in this form of action," and affirmed the decree as amended. The *Missouri Case* was decided in 1902, and its scope has been defined by *Lohse Patent Door Co.* v. *Fuelle*, 215 Mo. 421, 128 Am. St. Rep. 492, 22 L. R. A. (n. s.) 607, 114 S. W. 997, 1012, decided in 1908, more than six years later, where it was said: "The question there [in the *Watson Case*] discussed was whether or not, under the Constitution, defendants in that case could be enjoined from publishing a boycott, and it was there held that he could not be so enjoined; but that is not the purpose of this suit. The clear object of this case is to prohibit the defendants from continuing the boycott in force heretofore declared, or to enjoin the defendants from declaring a threatened boycott against plaintiff's business, and not to enjoin its publication. If this boycott itself is enjoined, there would be no occasion for complaint against its publication." So in the case at bar the continuance of the unlawful boycott itself, and of the other odious and illegal acts except the publications, which respondents threaten, may be enjoined without violating the constitutional provision as interpreted by this court in the *Lindsay Case*. There could then be no publication of the nonexistent boycott.

It is further respectfully but earnestly contended that the constitutional prohibition invoked in the *Lindsay Case* was misapplied by this court. The interdiction is not directed to the courts but is addressed only to the legislature. (*Gompers* v. *Buck's Stove & Range Co.*, 221 U. S. 418, 34 L. R. A. (n. s.) 874, 55 L. Ed. 797, 31 Sup. Ct. Rep. 492.) In the brief for respondent in the above case, pages 802 and 803 of 55 Lawyers' Edition of the Supreme Court Reports, will be found a long list of cases which, while not expressly deciding that similar constitutional provisions are not leveled at courts, do necessarily so decide.

No man is entitled to protection by law against competition, but he has the right to be protected against, and to be free from, wanton and malicious interference, disturbance or annoyances. Where the interference is without the justification of any legitimate interest, and is merely wanton or malicious, and would work irreparable injury, courts will grant relief by injunction to restrain the threatened repetition of such interference. (*Peek* v. *Northern Pac. Ry. Co.*, 51 Mont. 295, L. R. A. 1916B, 835, 152 Pac. 421; *Iverson* v. *Dilno*, 44 Mont. 270, 119 Pac. 719; *Martell* v. *White*, 185 Mass. 255, 102 Am. St. Rep. 341, 64 L. R. A. 260, 69 N. E. 1085; *Lohse Patent Door Co.* v. *Fuelle*, 215 Mo. 421, 128 Am. St. Rep. 492, 22 L. R. A. (n. s.) 607, 114 S. W. 997, and cases cited; *Graham* v. *St. Charles St. R. Co.*, 47 La. Ann. 214, 49 Am. St. Rep. 366, 27 L. R. A. 416, 16 South. 806; *Delz* v. *Winfree*, 80 Tex. 400, 26 Am. St. Rep. 755, 16 S. W. 111; *Ertz* v. *Produce Exch.*, 79 Minn. 140, 79 Am. St. Rep. 433, 48 L. R. A. 90, 81 N. W. 737; *Quinn* v. *Leathem*, 1 B. R. C. 197; *Matthews* v. *Shankland*, 25 Misc. Rep. 604, 56 N. Y. Supp. 123; *Dunshee* v. *Standard Oil Co.*, 152 Iowa, 618, 36 L. R. A. (n. s.) 263, 132 N. W. 371; *Tuttle* v. *Buck*, 107 Minn. 145, 131 Am. St. Rep. 446, 16 Ann. Cas. 807, 22 L. R. A. (n. s.) 599, 119 N. W. 946; *Wilson* v. *Hey*, 232 Ill. 389, 122 Am. St. Rep. 119, 13 Ann. Cas. 82, 16 L. R. A. (n. s.) 85, 83 N. E. 928; *George Jonas Glass Co.* v. *Glass Bottle Blowers' Assn.*, 77 N. J. Eq. 219, 41 L. R. A. (n. s.) 445, 79 Atl. 262; *Olive* v. *Van Patten*, 7 Tex. Civ. App. 630, 25 S. W. 428; *West Virginia Transp. Co.* v. *Standard Oil Co.*, 50 W. Va. 611, 88 Am. St. Rep. 895, 56 L. R. A. 804, 40 S. E. 591; *Emack* v. *Kane*, 34 Fed. 46; 1 Street's Foundations of Legal Liability, 353.)

*Mr. J. E. Healy*, for Respondents, submitted a brief; *Mr. B. K. Wheeler*, of Counsel, argued the cause orally.

MR. JUSTICE SANNER delivered the opinion of the court.

The essential facts in this case are as follows: That the plaintiff (appellant here) is a domestic corporation engaged, since

November 20, 1914, in conducting a theater and moving-picture show on Montana Street, in the city of Butte, called the Empire Theatre, an enterprise dependent upon patronage of the public for its success; that the defendants consist of the "Musicians Mutual Union, Local No. 241, American Federation of Musicians," with all its members, not specially named, the Silver Bow Trades & Labor Council, with all its members, not specially named, and certain named persons (thirty-nine in number) sued individually and as officers and members of either the Musicians Union or the Trades & Labor Council; that the Musicians Union and the Trades & Labor Council are voluntary, unincorporated associations, the former of the character known as a labor union formed for the purpose of advancing the condition of its members, the latter a sort of central body composed of delegates from the various labor unions of Butte, the purpose of which is to give to them coherence, solidarity and concert of action, with the power and influence which flow therefrom; that the combined membership of the unions affiliated to the Trades & Labor Council is more than 1,000, and such entire membership is affected whenever that body acts, as it is authorized to do, in the ordering, prosecution and furtherance of strikes and boycotts, its activities in that behalf being binding upon all and enforced by means of fines, expulsion and other penalties; that prior to November 17, 1914, the Musicians Union made demand upon the manager of the Empire Theatre that he employ five members of said union, at a wage rate fixed by it, to play at every show or exhibition of pictures given in said theater; that this demand was refused and the union, in order to enforce compliance therewith, declared a boycott against the said theater, and caused to be, from that date until and including November 29, 1914, carried by a man in a conspicuous place on the sidewalk, immediately in front of said theater during the performances therein, a canvas banner about three by four feet in size, on each side of which was printed in large letters the words, "Notice: The Empire Theatre is unfair to organized Labor"; that for the purpose of making its boycott effective, the union

solicited and secured the co-operation of the Trades & Labor Council, so that on November 29, said union, said Trades & Labor Council, and their respective members combined to boycott the plaintiff and its business, and thus to prevent it from securing sufficient patronage to successfully carry on the same unless it would yield to said demand; that in furtherance of such combination the said Trades & Labor Council did, on November 29, 1914, order and declare such boycott, and have caused the banner above mentioned to be carried in a conspicuous place, immediately in front of the Empire Theatre and within eight or ten feet of and in front of the entrance thereto every day since the twenty-ninth day of November, 1914, on which a show or exhibition of any kind was produced therein, and have also, on almost every day since November 29, 1914, publicly announced and openly published orally to the public in general in Butte that persons who patronized said theater would be regarded by the labor unions of Butte as unfair to organized labor and have also caused, on every day since November 29, 1914, and until the service of the restraining order herein, one or more men to stand on and walk along the street in front of and near the Empire Theatre to say, and who did say, to persons about to enter said theater and desiring to do so, that the said theater was unfair to organized labor, and to request, and who did request, such persons not to patronize the same; that these things were intended and done by the defendants and understood by the public as a threat that all persons patronizing the said Empire Theatre would be regarded by the defendants as unfair to union labor, would be listed as such, and would be compelled to pay money to the said union as a penalty, or else be themselves boycotted by the respondents; and the respondents propose to continue these acts, save as prevented or restrained by order of court; that the result of these acts has been to prevent many thousands of persons, desiring to patronize said theater, from doing so, to irritate, annoy and vex the plaintiff and its employees, to prevent the profitable conduct of plaintiff's business

and almost destroy the same, and to cause the plaintiff great, irreparable and incalculable damage.

Upon these facts, as alleged with much elaboration, the plaintiff sought a decree, perpetually enjoining the defendants and all persons acting for or under them, or any of them, "from further continuing any of the acts" above referred to, "from further boycotting the plaintiff and its business," "from boycotting any person who may hereafter patronize the said Empire Theatre," and "from in any manner interfering with the business of the plaintiff or with any of the employees of the plaintiff in the discharge of their duties"; but the trial court, though finding the facts to be substantially as above stated, held the plaintiff not entitled to any relief, and entered a judgment of dismissal, from which this appeal was taken.

The denial of any relief was expressly based upon the prior decisions of this court in *Lindsay & Co.* v. *Montana Federation of Labor, etc.,* 37 Mont. 264, 127 Am. St. Rep. 722, 18 L. R. A. (n. s.) 707, 96 Pac. 127, and *Iverson* v. *Dilno,* 44 Mont. 270, 119 Pac. 719, and the plaintiff, contending that the second part of the Lindsay opinion is *obiter,* insists that so much of both decisions as are really effective, as well as the later case of *Peek* v. *Northern Pacific Ry. Co.,* 51 Mont. 295, L. R. A. 1916B, 835, 152 Pac. 421, command, upon the facts found, a result exactly opposite.

The portion of the Lindsay opinion asserted to be *obiter* holds that injunction does not lie to restrain the publication of a circular denouncing an enterprise as unfair to organized labor, whether such publication emanate from one or from many persons, a conclusion which is assailed as altogether wrong. Considering how that case was presented, we cannot regard the part referred to as *obiter.* A comprehensive injunctional decree had been entered in the court below, which the respondents sought to sustain upon two contentions, *viz.,* that the boycott was itself unlawful, but that, if lawful, news of it could not be conveyed by circulars scattered broadcast and so phrased as to invite or advise all union men and their sympathizers to withhold their

patronage from Lindsay & Co., and from anyone else who patronized that concern. Obviously the matter could not be settled by deciding, as was done, that a boycott could lawfully be declared, but it became necessary to say whether the publication of it in the manner stated could be enjoined. The answer, necessarily negative, might have been put upon a different, and possibly better, ground than the one chosen; but this does not affect the decisional character of the answer itself or of the ground assigned for it. (*Clark* v. *Thomas,* 4 Heisk. (51 Tenn.) 419, 421.) [1] "An *obiter dictum* is a gratuitous opinion, an individual impertinence which, whether it be wise or foolish, right or wrong, bindeth none—not even the lips that utter it." The second portion of the Lindsay opinion does not come within this definition.

Counsel urge, however, that the conclusion is unsound because [2] the constitutional provision postulated as the basis of it (State Const., Art. III, sec. 10) is addressed to the legislature and not to the courts, because it in some way interferes with the power of courts of equity in cases of nuisance, and because it is contrary to the stand repeatedly taken by the supreme and other courts of the United States. The answer is not difficult. This court founded its decision upon the language of the provision above cited, which not only forbids the passage of any law impairing the freedom of speech—as does the national Constitution—but which also proclaims—as the national Constitution does not—that "every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty." We thought, as we still think, that this second clause of our provision conveys the idea of liberty, unchecked as to what may be published, by anything save penalty, and is therefore so material a departure from the meaning given to the national provision that the federal cases have little, if any, significance; and we were, as we still are, unable to conceive how anyone can possess the right to publish what he pleases, subject only to penalty for abuse, and at the same time be prevented by any court from doing so. It is to be remembered, however, that this court was dealing in the *Lindsay Case* with

the right to publish at large, not with the propriety of enjoin-
ing acts which, though they be in aid of the right to publish,
are brought, or sought to be brought, within the category of
nuisances.   That subject was considered somewhat in the *Dilno
Case* and will be referred to later in this opinion.

So premising, we come to the result common to both the *Lind-*
[3]   *say* and *Dilno Cases,* which is to declare that labor unions
are not unlawful in this state; that such unions may publish
and pursue a peaceful boycott against any person or enterprise
deemed by them to be unfriendly, and that a combination ·of
such unions or their members for such purposes cannot be viewed
as a conspiracy.   Attention is called to the emphasis laid in
the *Dilno Case* upon the want of an allegation that the publica-
tion there considered, to-wit, a banner, veiled a threat, whereas
the findings here establish that the acts of the defendants did
convey, and were intended to convey, a threat; and from this
it is deduced that the combination of the defendants became
indeed a powerful and far-reaching conspiracy.   The force of
this depends upon what is meant by the term "threat," or, to
put it in another way, upon what is threatened.   Generally
[4]   speaking, what one may do in a certain event, one may
give warning of an intention to do in that event; and such a
warning is not a threat in the legal sense, whatever may be im-
plied by the term in colloquial usage.   (*Payne* v. *Western etc.
Ry. Co.,* 13 Lea (81 Tenn.), 507, 49 Am. Rep. 666, 674; Holmes,
J., in *Vegelahn* v. *Guntner,* 167 Mass. 92, 107, 57 Am. St. Rep.
[5, 6]   443, 35 L. R. A. 722, 44 N. E. 1077.)   What, then, was the
"threat" conveyed by the acts of the defendants according to
the findings?   In the last analysis it was that all those who
patronized the theater in defiance of the boycott would them-
selves be classed as unfriendly and subjected to boycott in their
turn, a warning similar to that conveyed by the Lindsay circu-
lar, implicit in the Dilno banner, and necessarily involved in
every earnest boycott.   We realize that many courts treat this
as a threat in the legal sense because of the power of numbers
behind it, and have enjoined the execution of it upon the assump-

tion that the person boycotted is, through the intimidation of others, deprived of something to which he has a vested right. As we see it, this position is unwarranted in every particular. There is no intimidation in the legal sense unless there is a threat in the legal sense. Every person has the right, singly and in combination with others, to deal or refuse to deal with whom he chooses; to reach his decision in that, as in all other matters, upon or without good reason; to regard as unfriendly all those who, with or without justification, refuse to co-operate or sympathize. These rights do not depend upon the character, numbers or influence of those who seek to exercise them; nor upon the occasion for their exercise; nor upon the consequences which may follow from their legitimate use. They have been recognized by this court as existing in an incorporated railway benefit society (*Peek* v. *Northern Pac. Ry. Co., supra*), and it may be said in passing that they likewise belong to merchants' associations, to consumers interested in the cost of living, and, in some measure, to all other persons or groups of persons by whom a boycott may be conceived and practiced. The defendants had these rights, and, having them, could lawfully announce their intention to assert them. The plaintiff, on the other hand, has no vested right in the patronage of the defendants, or of anyone else who may choose to withhold it; and, no more than the plaintiff, have the persons who may choose to patronize it any vested right to such patronage. Such persons may take such patronage on the terms imposed, or not, as they see fit, just as the defendants and their friends may, if they see fit, choose to regard a rejection of these terms as a rejection of their patronage. In short, the "threat" conveyed was to do what the defendants lawfully could do—a mere warning of their intention, which they could lawfully give. (Cooke on Combinations, Monopolies and Labor Unions, secs. 77, *et cit.*) A combination to do a lawful thing by lawful means is no conspiracy. Counsel for plaintiff point to the occasion for this boycott, and eloquently denounce the effrontery of labor unions in dictating to those who are not held to them by any ties as offensive and as dangerous

to our most precious heritage, personal liberty. Offensive such dictation must certainly be, but not more offensive nor more dangerous, we think, than when the like is put forward by agencies of quite a different character. Attempted dictation, more or less disguised, is ever present; but it is not, in contemplation of the law, an invasion of liberty so long as it amounts to nothing more than a demand which one party has a legal right to make, upon the alternative of its displeasure, and the other the legal right to refuse, braving that displeasure. We see nothing in the *Peek Case* to interfere with the conclusions announced in the *Lindsay* and *Dilno Cases*, but much to confirm them, and we are satisfied that these cases correctly apply the law to present-day conditions. It follows that the judgment must be upheld so far as the boycott and its publication at large are concerned.

The plaintiff insists, however, that certain features of defendants' program as heretofore pursued and as proposed to be continued are subject to restraint as a nuisance. The defendants, contesting this, rely upon the provisions of subdivision 8, section 6121, Revised Codes, in conjunction with their right to use the streets and to publish what they will. The provision referred to is as follows: "An injunction cannot be granted: * * * In labor disputes under any other or different circumstances or conditions, than if the controversy were of another or different character, or between parties neither * * * of whom were laborers or interested in labor questions." (Thirteenth Session Laws, p. 28.) Touching this provision, we may say that it adds nothing to the pre-existing law, since there never has been, in theory at least, one rule for the wage-earner and another for the rest of the community; yet it must be taken as an expression by the legislature of the belief that injunctions have been granted in labor disputes when, under exactly similar conditions, they would not have been granted in controversies of a different character, and of an intention to forestall the possibility of such a happening in this state. So the propriety of an injunction here depends upon whether an injunction would be granted if the acts proposed were to be done by an associa-

tion of a different sort, as, for instance, a combination of merchants or consumers. To determine this the rights above mentioned are not entirely adequate. The right to publish what one pleases does not mean that one may always publish when and where he pleases; nor does his right to use the public streets imply that he may do entirely as he sees fit anywhere upon those streets. These are rights which, like all others, must be exercised with reference to the same or similar rights of one's neighbor as well as to certain public considerations. They are neither more nor less sacred than the right to possess property or the right to the free exercise of religious worship. Under the former, one may maintain a slaughter-house or a boiler factory, but not where such maintenance would constitute a nuisance; under the latter, the most saintly evangelist might be prevented from selecting as the place of his revival the front door of a cathedral or a synagogue. Similarly we think it entirely possible for a state of facts to exist under which the right to speak or publish might be so used as to constitute a nuisance and be restrained as such.

The difficulty here is that the facts found do not warrant application of the nuisance theory. In the *Dilno Case* we intimated that the acts of a single individual whose business it was to take his stand before one's door and there display a banner denouncing the owner as unfair, and thus, as well as by word of mouth, to dissuade others from entering, might constitute a nuisance, depending on whether they fall within the meaning of section 6162, Revised Codes. By this section, an act or thing to be a nuisance must be either: (a) Injurious to health; or (b) indecent or offensive to the senses; or (c) an obstruction to the free use of property so as to substantially interfere with the comfortable enjoyment of life or property; or (d) an unlawful obstruction to the free passage or use, in the customary manner, of any navigable lake, *etc.*, or public park or street, *etc.* Manifestly there was nothing injurious to health, or indecent, or offensive to the senses in what the defendants did, nor does the court in terms declare that what they did, created any ob-

struction to the free use by the plaintiff of its property or its right of access thereto. Does the inference of such obstruction follow from the facts found? We think not. The findings on this subject are: (1) That since November 29, 1914, the defendants have caused the banner to be carried in a conspicuous place immediately in front of the theater, and within eight or ten feet of the entrance on every day a show was given therein. In other words, the banner was carried at the place named at some time during each performance day—whether during the performance, whether once, twice, occasionally, many times or constantly is not stated—yet the defendants might have caused their banner to be carried upon and through every street in the city of Butte, passing or even occasionally stopping before the plaintiff's theater, without at all obstructing the free use thereof or free access thereto. (2) On almost every day since November 29, 1914, they publicly announced and openly published orally to the public in general in Butte that persons who patronized the theater would be regarded as unfair to organized labor, and caused one or more men to stand upon and walk along the street in front of and near the Empire Theatre to say, and who did say, to persons who desired and were about to enter it, that it was unfair to organized labor, and to request, and who did request, such persons not to patronize the same. How long, how often, at what time or times on each day such man, or men, so stood, how many there were at any time, how near they were when not in front, whether they there dissuaded few or many persons from patronizing the theater, cannot be determined; yet, as against any right of the plaintiff to prevent, the defendants could "publicly announce" and "openly publish" orally, or in all the prints of Montana, what it is found they did announce and publish, and could, without committing a nuisance to the plaintiff, stop every person in the city and communicate their message, so long as they did not take their stand in the immediate vicinity of the theater and there demean themselves so as to create an obstruction to the plaintiff's free use of its property or an obstruction of the streets as a means of access thereto.

(3) According to the plaintiff's brief, the court also found that the men carrying the banner interfered with and unlawfully laid hands on many persons desiring to patronize the theater, thereby intimidating and dissuading vast numbers of persons from entering the same.  We cannot discover any such finding, and do not infer it from what is said of paragraph 6 of the complaint; the idea presented throughout the decision below is that no physical violence or intimidation occurred.  (4) According to the plaintiff's brief, the court also found that the defendants have picketed the theater with the banner carriers to dissuade persons from entering it.  This is a deduction from the fact that the court negatives the allegations of paragraph 6 of the complaint that there were pickets in addition to the banner bearers, but affirms the allegations of paragraph 12 that the defendants "have picketed the plaintiff's said place of business as hereinbefore alleged," and propose to continue so to do.  The soundness of this deduction is not clear, since the only picketing "hereinbefore alleged" was by pickets other than the banner bearers as set out in paragraph 6 of the complaint.  But if we accept the deduction, it adds nothing to the case, since it does not appear that the "picketing" done by the banner bearers consisted of anything more than the acts already ascribed to them by the findings, which acts as we have seen were neither wrongful in themselves nor a nuisance.  (5) In consequence of all the acts complained of—those which are and those which are not supposed to constitute a nuisance—many persons were prevented from patronizing the plaintiff; vexation and annoyance were caused to it and its employees; great and irreparable damage was done to its business.  How much or whether any substantial part, of this result was due to those acts supposed to constitute a nuisance is not disclosed, and cannot be gathered from the fact that such loss or annoyance occurred; nor can such loss or annoyance alone give color to the acts.  Unless the things done constitute a nuisance as defined by our Code, prevention is out of the question, no matter what loss or annoyance ensued.  The evidence is not before us, but, from the findings as well as from

the legal reflections of the trial judge, it is apparent that the nuisance feature of the case had as little value in the district court as we must give it here.

In view of the foregoing, discussion of the question of parties is unnecessary.

The judgment is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.

Rehearing denied February 19, 1917.