[L. A. No. 16592. In Bank.—October 14, 1940.]

C. S. SMITH METROPOLITAN MARKET CO., LTD. (a Corporation), Respondent, v. JACK LYONS et al., Appellants.

Rosecrans & Emme, Bayard R. Rountree and Harry Albert for Appellants.

Henry B. Lister, as *Amicus Curiae*, on Behalf of Appellants.

Jonah Jones, Pierson & Block and Gibson, Dunn & Crutcher for Appellants.

Luce, Forward & Swing, as *Amici Curiae*, on Behalf of Respondent.

EDMONDS, J.—Injunctive relief granted an employer in a controversy with union labor over picketing occasioned this appeal. The market company had no union men employed and the purpose of the picketing was to bring about the establishment of a closed shop in its meat departments.

At the time the dispute arose, C. S. Smith Metropolitan Market Co., Ltd., was a California corporation, engaged in selling groceries, meats, and other commodities at retail. It owned and operated seven retail markets located in several cities in southern California. When these markets were picketed, the company sued Amalgamated Meat Cutters and Butcher Workmen Local Union 284, its officers and members, and also Central Labor Council of Long Beach and its secretary. After trial upon issues framed by the complaint and an answer alleging affirmative defenses, the court made findings and conclusions of law generally favorable to the market company and rendered judgment permanently restraining the appellants from picketing. The court also found that the market company had been damaged by the appellants' acts, but that the evidence was insufficient to establish the amount

which should be awarded therefor. The appeal is from this judgment.

The findings refer to ''plaintiff's employees'' but they must be considered as referring only to the workers employed in the respondent's meat departments. These findings include the following facts:

At the time the controversy arose, there was no strike or dispute concerning the terms and conditions of employment between the market company and its employees; the employees were entirely satisfied with their employment and had made no request upon their employer for a discussion concerning any matter involving terms of employment. The market company discharged several employees, but not because they were members of the butchers' union, and the market company did not discriminate against the organization. In fact, the president of the company instructed his manager to employ union men at one market and offered to pay the union initiation fee for any employees who desired to join the union, but none accepted the offer.

The business agent of the butchers' union made a request for a discussion concerning the terms and conditions of employment of its employees, but had no authority to represent the employees. So far as the market company was informed, none of its employees were members of any labor union and none had any desire to become members, but preferred to work under terms and conditions of their own choosing without interference by labor unions. The market company had not engaged in a course of intimidation against the employees to prevent them from joining labor unions; it had never been a party to any agreement with a labor union and had never requested the appellants to act as collective bargaining agent for its employees.

The sole purpose of the appellants' picketing was to compel the market company's employees to become members of the butchers' union and to compel the market company to discharge those who refused to join the union. For the accomplishment of their purpose, the appellants combined and conspired together to boycott and peaceably picket the market company's places of business. Pickets were stationed for the purpose of interfering with its patronage and inducing other merchants and their employees to cut off business relations. A further purpose of picketing, the court found, was ''to

obtain employment for union members . . . under good working conditions, fair wages and fair hours of labor'', to obtain an agreement with the market company for the employment of union members only, and to persuade ''meat cutters employed by . . . [the market company] to become members of the'' butchers' union. This union had contracts with a number of markets and butcher shops in Long Beach whereby such markets and butcher shops agreed to employ only members of the union; to pay them union wages for a maximum of 55 hours per week and to close on Sunday.

The respondent paid its butchers more than the union scale, with hours of employment less than the union schedule existing in Long Beach. All of the markets with which the defendant union had contracts did not adhere to union standards. The respondent did not increase its employees' wages and reduce their hours of employment because of the efforts of the butchers' union or for the specific purpose of making it appear to the public that it was paying fair wages or to persuade many of the employees not to join the union. It is not true that if the union's activities were abandoned, the market company would change working conditions in its markets to the detriment of its employees.

The presence of pickets at the market company's places of business led many prospective customers to believe that a labor dispute existed between it and its employees, with a consequent loss of patronage. The picketing also caused other business firms and their employees to refrain from selling or delivering merchandise to the market company. There follow findings of damage to the market company and of the inadequacy of the remedy at law. The conclusions of law state that the appellants' activities were unlawful, entitling the respondent to injunctive relief.

The appellants do not challenge the findings favorable to the employer upon the issues relating to (1) the existence of any strike or controversy between it and its employees concerning the terms and conditions of employment; (2) the union's contention that the market company pursued a course of discrimination against its members; and, (3) the union's further claim that the market company raised the wages and reduced the hours of its employees solely because of the efforts of the union and to prevent the unionization of those employees. But they attack other findings which they contend are not supported by the evidence.

They object first to the findings which state that the appellants "conspired" to unionize the market company's employees and "to compel" them to become members of the butchers' union and "to compel" the market company "to force" its employees to join the union. However, the words to which the appellants object are in reality mere conclusions and have little significance in the light of the more specific probative facts found by the court. The market company does not contend that the words "compel" and "force" refer to threats or acts of physical compulsion, nor could such a contention be made in view of statements both in its complaint and in another finding that the unionists maintained "a peaceable picketing".

The appellants also challenge parts of other findings which state, in substance, that the picketing was maintained for the purpose and had the effect of causing the market company's customers and prospective customers and the public to believe that a labor dispute existed between it and its employees when in fact no such dispute did exist, and through such wrongfully induced belief, these persons refrained from patronizing the company. Upon this issue the evidence shows that the pickets used no placards or printed matter but occasionally stated to passers-by "this market is unfair", or, "this market is unfair to organized labor", or, "this place is non-union", or, "this is a non-union shop".

By general understanding the respondent argues, picketing indicates that union employees are on strike because of a labor dispute between them and their employer. But it is a matter of common knowledge that unions do not limit the use of the picket to such occasions. And even assuming that some members of the public may have refused to patronize the market company solely because they believed that it was having a dispute with its employees and for no other reason, that fact does not make the appellants' conduct fraudulent. Peaceful picketing is commonly used by unions to advertise labor's grievances and may not be enjoined when the purpose is reasonably connected with a controversy which affects workers in an industry generally as well as those employed by the person against whom it is directed. If an employer is marketing commodities under nonunion conditions, it is not unlawful for labor unions to notify the public of that fact by peacefully picketing his place of business.

This was recognized in the case of *Parkinson Co.* v. *Building Trades Council*, 154 Cal. 581 [98 Pac. 1027, 16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550], where the court said: "In reference to the word 'unfair' it clearly appears that as employed by the defendants and labor organizations generally, it has a technical meaning. . . . Such declaration means, and in this instance was understood by all parties concerned to mean, not that the plaintiff had been guilty of any fraud, breach of faith, or dishonorable conduct, but only that it had refused to comply with the conditions upon which union men would consent to remain in its employ or handle material supplied by it."

For these reasons any findings in this case which may be construed as indicating that the appellants' picketing was fraudulent are not supported by the evidence.

But there are other findings which seem to imply that the appellants' conduct was *per se* unlawful. These state that one of the purposes of the picketing was to cause other business firms and their employees to refrain from selling or delivering merchandise to the market company, and that such was the effect of the picketing, although these third persons were not refusing to deal with the market company "entirely voluntarily . . . and because they do not desire to deal with a place of business . . . unfair to organized labor". These findings, however, do not show that the form of appellants' concerted action was unlawful.

It has long been the established law of this state that the secondary boycott is a form of economic pressure which labor organizations may properly employ in pursuit of any lawful end (see cases cited in *McKay* v. *Retail Automobile Salesmen's Union* (*ante*, p. 311 [106 Pac. (2d) 373]), and the mere fact that in picketing the market company's places of business the appellants intended to institute a boycott against it does not make the picketing illegal. Moreover, it is obviously untrue that when truck drivers employed by other firms refuse to go through the picket line, they do so involuntarily. Such refusal is undoubtedly based upon the freely adopted rules of the local union to which they belong. In the present case, therefore, as peaceful means were adopted by the unionists in their picket and boycott, such action was lawful if reasonably relevant to working conditions and the purposes of collective bargaining.

■ In *Shafer* v. *Registered Pharmacists Union* (*ante*, p. 379 [106 Pac. (2d) 403]), it was held that closed union shop contracts are not unlawful under sections 920–923 of the Labor Code, and in *McKay* v. *Retail Automobile Salesmen's Union, supra*, this court decided that labor organizations may engage in concerted action against a partially unionized employer in order to obtain a closed union shop. It declared that such action was not an unlawful interference with the rights of nonunion employees.

■ The findings and evidence in the present case present a further question. They show that the market company's employees, none of whom was a member of the union, were satisfied with the terms and conditions of their employment, were not on strike, and were not engaged in a labor dispute with their employer. In its briefs, the market company attaches considerable importance to these findings and argues that peaceful picketing of a closed, nonunion shop by a labor organization is unlawful where there is no strike or dispute between the employer and his employees.

But there is no magic in the words "strike" or "labor dispute" and it is begging the question to make the justification for concerted action depend upon the existence of a strike, which is itself a weapon in the struggle. Justification, or the lack of it, depends upon the purpose for which the means of concerted action is used rather than upon the type of means used. "Picketing without a strike is no more unlawful than a strike without picketing." (*Exchange Bakery & Restaurant* v. *Rifkin*, (1927) 245 N. Y. 260 [157 N. E. 130, 132].) (See, also, 40 Harv. L. R. 596; 27 Columb. L. R. 190.)

It is equally clear that the term "labor dispute" is not the criterion for decision of this case under California law. The term, as used in this connection, appears to have been first injected into the law by the enactment of the anti-injunction amendment to the Clayton Act and several state prototypes. (38 Stats. at Large 730, secs. 6, 20; Cal. Stat. 1903, p. 289; 1909, chap. 362, Minn. Stat. Mason (1927), sec. 4258; Or. L. (Olson, 1920), sec. 6817; Wash. Comp. Stat. (Remington, 1922), sec. 7613; Wis. Stat. (1927), sec. 113.05, and others. See Fraenkel, Recent Statutes Affecting Labor Injunctions and Yellow Dog Contracts, 30 Ill. L. R. 854; Fraenkel, Judicial Interpretation of Labor Laws, 6 Chic. L. R. 577, 579; also, Brandeis, J., dissenting in *Duplex Printing Press Co.* v.

*Deering,* 254 U. S. 443 at 484 [41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196].) These laws, which were the fruit of years of agitation by organized labor, sought to exempt unions from the common law doctrine of "conspiracy" as well as from the statutory concept of "combinations in restraint of trade" and prohibited the courts from enjoining peaceful concerted action by workmen in cases "involving or growing out of a dispute concerning terms or conditions of employment". Most of them, including that of California, have been repealed.

The term "labor dispute", therefore, appears to be a term of statutory law unknown to common law and first used and invoked in enactments attempting to curtail injunctive interference by courts in labor controversies. The earliest attempts to do so forbade its use in "labor disputes" and by judicial interpretation that prohibition was held not to extend beyond disputes in which employer and employee alone were the participants. (See *Duplex Printing Press Co.* v. *Deering, supra.*) Later legislation, such as the Norris-La Guardia Act, *supra,* forbids judicial intervention in labor controversies though nonemployees participate or even alone cause the dispute, provided the dispute has relevance to employment relations. (*Lauf* v. *E. G. Shinner & Co.,* (1938) 303 U. S. 323 [58 Sup. Ct. 578, 82 L. Ed. 872]; *New Negro Alliance* v. *Sanitary Grocery Co.,* 303 U. S. 552 [58 Sup. Ct. 703, 82 L. Ed. 1012].) In California the words have no statutory definition.

█ The gravamen of the charge against the appellants under the findings in the present case is a conspiracy to damage the market company by intentionally interfering with its business. However, here, as in *McKay* v. *Retail Automobile Salesmen's Local Union, supra,* the damage to the employer was not absolute. The market company was presented with the choice of yielding to the union's demands or continuing to endure the interference with its business relations which the appellants' activities caused. The right of an individual to carry on his business as he pleases is by no means an absolute one. Numerous valid restrictions upon such a right have been enacted by the legislature, as, for example, the Cartwright Act (Stats. 1907, p. 984), the Fair Trade Act (Stats. 1931, p. 583), and many other provisions regulating compensation, hours of labor, and working conditions generally.

(See Labor Code, *passim.*) And it is now recognized that an employer has no constitutional right to conduct his business as a closed nonunion shop. (*American Steel Foundries* v. *Tri-City etc. Council* (257 U. S. 184 [42 Sup. Ct. 72, 66 L. Ed. 189, 27 A. L. R. 360]), *supra;* Magruder, A Half Century of Legal Influence Upon the Development of Collective Bargaining, 50 Harv. L. Rev. 1071, 1086.) The interference with the employer's business must, therefore, be considered in its relation to the purposes of the appellants.

The law does not invariably give relief against acts causing loss and the field of business competition furnishes numerous examples of intentional infliction of damage without legal remedy. (*American Auto Assn.* v. *American Auto Owners Assn.* (1932) 216 Cal. 125 [13 Pac. (2d) 707, 83 A. L. R. 699] ; *Union Labor Hospital* v. *Vance Lumber Co.,* (1910) 158 Cal. 551 [112 Pac. 886, 33 L. R. A. (N. S.) 1034] ; *Katz* v. *Kapper,* (1935) 7 Cal. App. (2d) 1 [44 Pac. (2d) 1060] ; *Dr. Miles California Co.* v. *Sontag Chain Stores Co.,* (Cal. App.) 47 Pac. (2d) 540, superseded by reason of the enactment of Fair Trade Act in 8 Cal. (2d) 178 [64 Pac. (2d) 726] (1937) ; *Mogul Steamship Co.* v. *McGregor,* 61 L. J. Q. B. 295 (1892) ; see, also, *Bohn Mfg. Co.* v. *Hollis,* (1893) 54 Minn. 223 [55 N. W. 1119, 40 Am. St. Rep. 319, 21 L. R. A. 337] ; *Macauley* v. *Tierney,* (1896) 19 R. I. 255 [33 Atl. 1, 61 Am. St. Rep. 770, 37 L. R. A. 455] ; *Cote* v. *Murphy,* (1893) 159 Pa. St. 420 [38 Atl. 190, 39 Am. St. Rep. 686, 23 A. L. R. 135] ; *Payne* v. *Western etc. Ry.,* (1884) 13 Lea (Tenn.), 507 [49 Am. Rep. 666].) The damage is nonetheless justified when inflicted by a combination of business men than by one (*Union Labor Hospital* v. *Vance Lumber Co., supra*; *Mogul Steamship Co.* v. *McGregor, supra*) or by large aggregations of capital in corporate form.

The damage may hit the competitor directly, as when a chain bank or chain grocery enters a community too small to support more than the local establishment already there, or may affect merchants generally, as when a wholesaler opens a retail store solely for the purpose of competing with certain retailers until they withdraw their patronage from a competing wholesaler. (*Katz* v. *Kapper, supra.*) In the absence of legislation laying down rules for the contest (see the Cartwright Act, *supra,* and the Fair Trade Act, *supra*) or where the acts complained of are outside the scope of such

legislation, business men are apparently free to inflict damage in the struggle of competition so long as they abstain from violence, fraud or other unlawful conduct.

"Everyone who enters the field of competition desires and plans to draw custom from his competitors. Unless his acts are unlawful, his avarice is not actionable." (*American Auto Assn.* v. *American Auto Owners Assn., supra,* at p. 142.) "The fact that the methods used were ruthless, or unfair, in a moral sense, does not stamp them as illegal. It has never been regarded as the duty of courts to regulate practices in the business world beyond the point of applying legal or equitable remedies in cases involving acts of oppression or deceit which are unlawful. Any extension of this jurisdiction must come through legislative action." (*Katz* v. *Kapper, supra,* at p. 6.) The justification for such conduct is said to be that free competition is generally considered worth more to society than it costs. (Holmes, J., dissenting in *Vegelahn* v. *Guntner,* (1896) 167 Mass. 92, 106 [44 N. E. 1077, 57 Am. St. Rep. 443, 35 L. R. A. 722].)

The foregoing principles are relevant and have been applied to competition in the field of labor. The use of any of the lawful methods of concerted action in this field—stopping work, persuading others not to work, interfering with advantageous trade relations—all necessarily cause economic loss not only to the parties directly affected but to customers and often to the public generally. Nevertheless, in the struggle for existence the fact of damage to others, intentionally inflicted, does not warrant injunctive relief against workmen any more than it does against business men, if it is inflicted in pursuit of a legally justifiable object. (*Parkinson Co.* v. *Building Trades Council, supra.*)

The underlying reason beneath these rules is a widespread belief in competition, free enterprise, and equality of opportunity. Statutes such as the Cartwright Act and the Fair Trade Act, *supra,* represent interference with the free play of competition in specific situations where the legislature has concluded that the competitive struggle has become unequal or unfair. And the inequality of bargaining power between employer and employee has long been fully recognized by legislation curtailing the employer's freedom to bargain with his employees as he chooses. For example, California has statutes dealing with compensation (Labor Code, secs. 200–452), working hours (secs. 510–856, id.), women and minors

(secs. 1171–1398, id.), immigrants (secs. 1460–1486, id.), employment agencies (secs. 1550–1681, id.), unemployment relief (secs. 2010–2183, id.), health (secs. 2260–2606, id.), employment relations (secs. 2700–3091, id.), workmen's compensation and insurance (secs. 3201–6002, id.), and safety in employment (secs. 6300–7601, id.).

Even more significant is section 923 of the Labor Code which declares the legislative policy of this state in favor of collective action by workmen. That section likewise declares the legislative reasons for favoring such a policy. Individual workmen, it is said, are not free to exercise actual liberty of contract in bargaining for work with employers. This is so because the latter have been permitted "to organize in the corporate and other forms of capital control" of great economic strength. Hence, in order to equalize bargaining power it is said to be necessary that workmen be permitted to organize and to engage in "concerted activities for the purposes of collective bargaining or other mutual aid or protection". This is not an effort by the legislature to destroy free competition; it is rather an attempt to insure an equality of bargaining power upon which the benefits of competition and free enterprise rest, and thus to secure to the individual workman a larger measure of freedom in his dealings with employers of labor. In other words, combination and organization are permissible on both sides, and the determination of terms and conditions of employment is to be left to bargaining and competition by these organizations in a free and unrestricted market.

It may very well be that combination and organization on one side or the other places in the hands of a few persons an immense power which, in the general welfare, ought to be limited and controlled. But these are considerations for the law-making power, not for courts. And considering sections 921 and 923 of the Labor Code, a court is not more justified in fettering by injunction the bargaining power of workmen merely because they are organized in a union than it would be in fettering the bargaining power of employers because they are organized in partnerships, joint ventures or corporations. Accordingly, in cases such as the present one, the determinative issue is whether the workmen are demanding something which is reasonably related to employment and to the purposes of collective bargaining. More specifically, the pro-

priety of lawful concerted action depends upon whether the workmen have such an interest in the employment relationship that the attainment of their object will benefit them directly or will enhance their bargaining power.

■ The members of a labor organization may have a substantial interest in the employment relations of an employer although none of them is or ever has been employed by him. The reason for this is that the employment relations of every employer affect the working conditions and bargaining power of employees throughout the industry in which he competes. Hence, where union and nonunion employees are engaged in a similar occupation and their respective employers are engaged in trade competition one with another, the efforts of the union to extend its membership to the employments in which it has no foothold is not an unreasonable aim.

Modern industry is not organized on a single shop basis, and it is a logical corollary of the collective bargaining principle that independent labor organizations should be permitted to grow and extend their bargaining power beyond the single shop. The market for a product may be so competitive that one producer cannot maintain higher labor standards resulting in higher costs than those maintained by his nonunion competitors.

Nor is the interest of the union in extending its organization any less substantial where the labor standards of the nonunion shop are on an equality with those of its union competitors. Under these circumstances, it may reasonably be believed vital to union interests to organize such a shop, for there can be no doubt that the receipt by other workmen of equivalent benefits without suffering correlative union responsibility serves to create intraunion unrest and disaffections.

Tested by those principles, it is apparent in the present case that the members of the butchers' union have a substantial interest in the employment relations of the market company. The findings show that the union had contracts with a number of other markets and butcher shops in Long Beach under which they agreed to employ only members of the union and to comply with union standards of employment, including the union scale of wages and hours and night and Sunday closing of butcher shops. It was also found that not all of the markets with which the union had contracts adhere

to union standards of employment. On this point the evidence shows that these shops refuse to comply with union standards until their competitors are unionized. It is immaterial that the respondent pays its butchers more than the union scale with hours of employment less than those fixed by the union. The market company's president admitted that he would not sign a union contract if it required night and Sunday closing, although a city ordinance provided that butcher shops be closed at such times. Under these circumstances, it is clear that the continued operation of the respondent's shops under nonunion conditions had an immediate effect upon both the working conditions and bargaining power of all the union butchers employed in Long Beach. The appellants were, therefore, privileged to direct against the market company any peaceful form of concerted action within their control.

The case of *In re Lyons*, (1938) 27 Cal. App. (2d) 182 [80 Pac. (2d) 745], fully supports this conclusion and is in accordance with the reasoning and conclusions of the New York court of appeals. (*Stillwell Theatre, Inc.*, v. *Kaplin*, (1932) 259 N. Y. 405 [182 N. E. 63, 84 A. L. R. 6]; *Wise Shoe Co.* v. *Lowenthal*, (1936) 266 N. Y. 264 [194 N. E. 749]; *Exchange Bakery, etc.*, v. *Rifkin, supra*.) Courts in other jurisdictions have also held that peaceful concerted action by labor unions against nonunion employers may not be enjoined. (*Kirmse* v. *Adler*, (1933) 311 Pa. 78 [166 Atl. 566]; *Smythe Neon Sign Co.* v. *Local Union, etc.*, (1939) 226 Iowa, 191 [284 N. W. 126]; *American Steel Foundries* v. *Tri-City Council, supra*; *Empire Theatre Co.* v. *Cloke*, (1917) 53 Mont. 183 [163 Pac. 107, L. R. A. 1917E, 383]; *Steffes* v. *Motion Picture etc. Union*, (1917) 136 Minn. 200 [161 N. W. 524]; *Music Hall Theatre* v. *Moving Picture etc. Local*, (1933) 249 Ky. 639 [61 S. W. (2d) 283]; but see *Hotel etc. Union* v. *Miller*, (1938) 272 Ky. 466, 471 [114 S. W. (2d) 501].)

However, it is conceded that the courts in some states have enjoined peaceful picketing by a labor union in the absence of a dispute between the employer and his employees. This conclusion is reached in most cases by calling the privilege of an employee to work as a nonunion man, or the privilege of the employer to conduct his business as he chooses, a constitutional right which may not be interfered with by a union in its endeavors to extend its bargaining power.

(*Mitnick* v. *Furniture Workers Local,* (1938) 124 N. J. Eq. 147 [200 Atl. 553]; *Fornili* v. *Auto Mechanics Union,* (1939) 200 Wash. 283 [93 Pac. (2d) 422]; *Roth* v. *Local Union, etc.,* (1939) (Ind.) 24 N. E. (2d) 280]; *Swing* v. *A. F. of L.,* (1939) 372 Ill. 91 [22 N. E. (2d) 857]; *Keith Theatre* v. *Vachon,* (1936) 134 Me. 392 [187 Atl. 692]; *Lyle* v. *Local No. 452,* (1939) 174 Tenn. 222 [124 S. W. (2d) 701].) Such reasoning is specious in that it begs the question in issue. It was rejected by this court in the Parkinson case and by the Supreme Court of the United States in the Senn case. As Mr. Justice Holmes aptly put it ''But the word 'right' is one of the most deceptive of pitfalls; it is so easy to slip from a qualified meaning in the premise to an unqualified one in the conclusion. Most rights are qualified.'' (*American Bank & Trust Co.* v. *Federal Bank,* (1921) 256 U. S. 350, 358 [41 Sup. Ct. 499, 65 L. Ed. 983, 25 A. L. R. 971].)

Other courts have sanctioned such an injunction upon the ground that the interest of the labor union is too remote under such circumstances. (*Berry* v. *Donovan,* (1905) 188 Mass. 353, 359 [74 N. E. 603, 108 Am. St. Rep. 499, 3 Ann. Cas. 738, 5 L. R. A. (N. S.) 899]; *Quinton's Market* v. *Patterson,* (1939) 303 Mass. 315 [21 N. E. (2d) 546]; *Moreland Theatres Corp.* v. *M. P. Union,* (1932) 140 Or. 35, 47 [12 Pac. (2d) 333]; *Culinary Workers Union* v. *Fuller,* (1937) (Tex. Civ. App.) 105 S. W. (2d) 295; *Hughes* v. *Kansas City etc. Local,* (1920) 282 Mo. 304 [221 S. W. 95].) Occasionally peaceful picketing of a nonunion shop has been enjoined upon the ground that under the particular circumstances the controversy was so bitter that orderly picketing could not be maintained. (*Busch etc. Co.* v. *United etc. Local,* (1939) 281 N. Y. 150 [22 N. E. (2d) 320, 124 A. L. R. 744]. Compare *May's Furs* v. *Bauer,* (1940) 282 N. Y. 331 [26 N. E. (2d) 279]; 28 Cal. L. Rev. 352, 364.)

But in this state, ever since the decision in the Parkinson case the courts have recognized the right of labor unions to engage in concerted action to obtain a union shop, or, in other words, to strengthen their bargaining power. The fear that they have grown so strong as to endanger vital civil liberties and disrupt the functioning of our economic system is an argument exclusively for the consideration of the legislature. Upon this point Mr. Justice Brandeis aptly stated in one of his dissenting opinions: ''Because I have come to the conclusion that both the common law of a state and a statute of the

United States declare the right of industrial combatants to push their struggle to the limits of the justification of self-interest, I do not wish to be understood as attaching any constitutional or moral sanction to that right. All rights are derived from the purposes of the society in which they exist; above all rights rises duty to the community. The conditions developed in industry may be such that those engaged in it cannot continue their struggle without danger to the community. But it is not for judges to determine whether such conditions exist, nor is it their function to set the limits of permissible contest and to declare the duties which the new situation demands. This is the function of the legislature, which, while limiting individual and group rights of aggression and defense, may substitute processes of justice for the more primitive method of trial by combat.'' (*Duplex Printing Press Co.* v. *Deering*, (1921) 254 U. S. 443, 448 [41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196].)

The judgment is reversed and the trial court is directed to dismiss the action.

Gibson, C. J., Carter, J., and Moore, J., *pro tem.*, concurred.

CURTIS, J., SHENK, J., and MARKS, J., *pro tem.*, Dissenting.—We dissent for the reasons stated in the dissenting opinions in the case of *McKay* v. *Retail Automobile Salesmen's Local Union, No. 1067*, S. F. No. 16016 (*ante*, pp. 335, 336 [106 Pac. (2d) 373]).

Rehearing denied. Shenk, J., Curtis, J., and Houser, J., voted for a rehearing.