MOEBIUS et al. v. LOUIS DEJONGE & CO.

LOUIS DEJONGE & CO. v. MOEBIUS et al.

(District Court, S. D. New York. May 7, 1914.)

Nos. 9—277, 9—361.

1. TRADE-MARKS AND TRADE-NAMES (§ 93*)—UNFAIR COMPETITION—EVIDENCE.
    A manufacturer and seller, who is charged with unfair competition, is not chargeable with an occasional remark of an unidentified occasional salesman of his product, based on misrepresentations by the salesman, so as to confuse the product of the manufacturer with a product of the complaining manufacturer.
    [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 104–106; Dec. Dig. § 93.*]

2. TRADE-MARKS AND TRADE-NAMES (§ 93*)—UNFAIR COMPETITION—EVIDENCE.
    The court in a suit by a manufacturer to restrain a rival manufacturer from unfair competition must, if possible, determine from the appearance of the articles themselves whether the purchasing public may be de-

ceived, unless a course of conduct is proved which shows the employment of methods and means indicating unfair competition, and in doubtful cases actual instances of confusion by the purchasing public may assist in arriving at a correct decision.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 104–106; Dec. Dig. § 93.*]

3. TRADE-MARKS AND TRADE-NAMES (§ 70*) — UNFAIR COMPETITION — EVIDENCE.

Where the original manufacturer of a fly catcher, known to the trade as the "Pyramid," showed that a hanger ribbon of red, white, and blue was a distinctive item of the article, and that its label was divided into three vertical spaces, in one of which was the name of the article, and in another printed directions, and in another the name of the manufacturer, and that a subsequent manufacturer of a fly catcher, known to the trade as the "Spiralette," also used at times a hanger ribbon of red, white, and blue, and advertised that it was "First in the Fight," and that its label was also divided into three vertical spaces, omitting the name of the manufacturer, the original manufacturer was entitled to an injunction to compel the subsequent manufacturer to adopt a hanger of a single color and cease the use of the words "First in the Fight" or anything similar thereto, and put on its label its name or some legend indicating that the article does not come from the original manufacturer.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81; Dec. Dig. § 70.*]

4. TRADE-MARKS AND TRADE-NAMES (§ 69*)—UNFAIR COMPETITION—MOTIVE.

Motive is not an essential element of unfair competition, though often valuable in determining the existence of unfair competition.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 80; Dec. Dig. § 69.*]

In Equity. Suits by Emil Moebius, doing business as E. Obin, and others against Louis Dejonge & Co., and by Louis Dejonge & Co. against Emil Moebius and others. Decree for complainant in second suit.

Prindle & Wright, of New York City (Edwin J. Prindle and Arthur Wright, both of New York City, of counsel), for complainants in suit No. 1 and for defendants in suit No. 2.

Kenyon & Kenyon, of New York City (Robert N. Kenyon and James S. Lehmaier, both of New York City, of counsel), for defendant in suit No. 1 and for complainant in suit No. 2.

MAYER, District Judge. The suit of Moebius et al. against Louis Dejonge & Co. is for an injunction restraining the defendant in that suit from sending out letters to or otherwise notifying the trade that complainants therein are guilty of unfair competition in selling their flycatchers in their present form, dressing, and appearance. In that litigation a motion for an injunction was made to restrain Louis Dejonge & Co. from sending out letters pendente lite. This motion was denied by Judge Lacombe on August 7, 1912, with the proviso that Dejonge & Co. would bring suit against Moebius and his associates, to test the question of unfair trading, on or before October 7, 1912. Prior to that date the second suit, wherein Louis Dejonge & Co. is complainant, was brought against Moebius et al.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

For convenience, the suit of Moebius et al. against Louis Dejonge & Co. will be called suit No. 1, while that of Dejonge & Co. against Moebius et al. will be called suit No. 2.

Suit No. 2 will be first discussed and will be deemed to include the testimony of Bruno Weimar, Edward Weimar, Mathiesen, Dreyfuss, and Amberg. In suit No. 2 complainant charges defendants with unfair trading by reason of the sale of flycatchers which are made in imitation of the flycatchers of the complainant, so close as to constitute unfair competition. The bill prays for an injunction and an accounting in the usual form.

Complainant is a New York corporation which manufactures and imports paper goods and novelties and has acquired a high reputation for the quality of its goods generally.

About the beginning of 1909, complainant began the business of selling flycatchers; its president being convinced of the commercial possibilities of a flycatcher known as the "Pyramid," which was then manufactured by Max Dametz, of Zeitz, Germany, but which had not been sold prior to that time in this country. The flycatcher material of the "Pyramid" is conical in shape, formed by a spirally wound tape. This tape has a preparation on it which is said to attract flies and, in practical use, is hung at some convenient place. This cone-shaped material is inclosed in a small cylindrical box and encircled with a detachable plate at the bottom. Louis Dejonge & Co., of course, desired to make the appearance of this article distinctive. The cylindrical box or inclosure was two inches long and an inch in diameter. It had two caps, one on each end; the flange of the cap extending over the side of the tube for about a quarter of an inch. The hanger projected through the middle of the upper cap and was parti-colored; these colors being arranged in bands or stripes running lengthwise of the hanger. When the business was started in 1909, different combinations of color were used, including yellow, blue, and green. The plate, which was corrugated, was adapted to be slipped over the lower cap of the flycatcher, was round in shape, and was about $3\frac{5}{8}$ inches in diameter. The tube, caps, and plate were brown in color; the upper surface of the plate having a design on it representing a woven fabric or basket weave. At that time the articles were put up in boxes of 100, and the boxes were made of a brown pasteboard, with a sort of basket weave pattern on its surface. In 1910 the goods were packed in boxes or cartons of 50 each. In 1911 a label of a light green color was adopted, and the parti-colored ribbon or hanger was limited in color to red, white, and blue. In the same year a new form of box was adopted (Dejonge Exhibit No. 12). The plain box with the so-called basket weave pattern was discarded for a box with the words "Pyramid Fly Catcher" prominently displayed on the outside and inside, and with other words upon it; the colors of the box being mainly yellow, green, and red, and the box having a rather striking appearance, one of its features being a representation of the cone as drawn out inclosed in its base, with flies clustering about and sticking to the cone and sticking to the base.

In 1912 the only change of importance was the addition to the fly-

catcher label of the representation of a pyramid and two palms under the word "Pyramid." (Flycatchers contained in Dejonge Exhibit No. 13).

While, therefore, the cylindrical shape and the name "Pyramid" were the same in 1912 as in 1909, the appearance of the box was entirely different from and after 1911, and in 1912 the label on the flycatcher had an added distinctive feature in the form of the pyramid with a palm on each side thereof.

About March, 1912, the defendants began to place on the market their flycatcher which they called "Spiralette." This also contained a flycatcher material which, when elongated, would be of cone shape and was inclosed in a cylindrical box or cover with two caps, and also was designed to be fitted into a base. While the measurement of the cylinder and the base were slightly different from those of the Pyramid, it may be said that for ocular purposes they were substantially the same.

The color used on the "Spiralette" label was blue, on the two caps red, and the base was red with white spots, while the base of the Pyramid was brown or tan. For the hanger, defendants used various colors, but many of its hangers were red, white, and blue.

Both labels are divided into three vertical spaces by vertical lines, in one of which is the name of the article, and in another of which are printed directions. In the Pyramid the third space contains the words "Agents, Louis Dejonge & Company, 69-73 Duane Street, New York City," while in the "Spiralette" are the words "Mark registered."

Defendants sent out with the box of their flycatchers a red poster bearing at the top, in conspicuous large red letters, the words "First in the Fight," and with the design which would seem at a casual glance to be of the same general character as the elongated cone on the box of the Pyramid.

In 1912 defendants sold their flycatchers in boxes of 100. These boxes were of brown paper and had a design somewhat like the basket weave of the Pyramid in 1909.

In 1913 defendants placed the words "Patented in the U. S. A." on some of their flycatchers, although there is no doubt that defendants' flycatcher was and is not made in accordance with the patent to which these words purport to refer. These words should not have been used, but their use is of no importance in arriving at a conclusion herein. After the litigation between the parties had started, defendants ceased, for a time, using the "First in the Fight" poster, but, as I understand, insist that they had the right to use this poster and would have the right to do so now.

Flycatchers of the kind here in controversy were not known to the American market prior to the introduction of the Pyramid. It is claimed that the testimony of the Weimars, Mathiesen, Dreyfuss, and Amberg shows that some were on sale in this country as early as 1904, but, viewing that testimony in the light most favorable to defendants, the appearance of these flycatchers in this country was of a passing and accidental character and is of no consequence in this case. Nothing that the Weimars did made the article known, and, in

analogy, the incident was not even as informing as an abandoned experiment in the case of a patent.

[1] Complainant has introduced testimony as to misrepresentations of salesmen of defendants and confusion and mistakes by purchasers of these two articles. The salesmen are not identified, and, where only sporadic incidents are ascertained, a merchant is not chargeable with an occasional remark of an unidentified occasional salesman.

[2] Little aid is furnished by the testimony of witnesses as to confusion when that testimony is taken by deposition. In open court the judge can form his opinion of the point of view and mental attitude of the person who gives testimony of this character. There is no reason to doubt that the illustrations given by the witnesses in the case at bar are truthfully stated, and, of course, in doubtful cases actual instances of confusion may be helpful in arriving at a correct decision; but, generally speaking, the court must, if possible, diagnose the subjective symptoms of the purchasing public from the appearance of the articles themselves, unless a course of conduct is proved which shows the employment of methods and means indicating unfair competition.

[3] I am satisfied from the evidence in this case that the parti-colored hanger plays a very important part. When these cylindrical shaped flycatchers are ready for sale by the retailer, the box is open, and the parti-colored hanger is the first item of the article which strikes the eye. It is very natural that a person buying a small article of this kind, who might not carry the name of the article in his memory, would remember, nevertheless, that the flycatcher which he wanted had a hanger ribbon of red, white, and blue. It is quite likely also that so much of the public as had been educated by the advertising and selling campaign of Louis Dejonge & Co., who believed that this was the first flycatcher of this kind in this country, would be misled by the red poster "First in the Fight," and more especially because the Spiralette did not contain the name of the manufacturer or sales agent. If the purchaser did not think that he was buying precisely the same flycatcher, he might very well think that he was buying a flycatcher placed on the market by the same concern.

There is a good deal of controversy as to the meaning of the phrase "First in the Fight" on the red poster advertisement. I should say that to some people it would mean that the article was the first to have been placed on the market, while to others it might mean the foremost or best article. Evidently for the purpose of showing that there was no intent to be unfair, defendants have insisted that the testimony warrants the conclusion that "First in the Fight" was a fair translation from its German poster of the phrase "Auf in den Kampf," but that German phrase (defendants' translator to the contrary notwithstanding) does not mean "First in the Fight." It is a battle cry and means "on to the battle." [1]

In any event, I am of opinion that, in view of the phrase and of the design, there would be enough people who would mistake the poster as referring to the Dejonge flycatcher, so as to result in confusion.

[1] While the translator's testimony is in suit No. 1, it may just as well be discussed here.

With the exceptions noted, I am unable to see in what other particulars defendants may be successfully charged with unfair trade. The Pyramid box of 1909 was not distinctive and could not be appropriated by complainant, and, indeed, was abandoned by complainant, while, on the other hand, defendants' present box, inside and outside, is entirely different from complainant's present box. In arriving at this, to me, obvious conclusion, I have not paid any attention to the history of the mushroom which is said to be the model for defendants' design, and, as a layman in the art of flycatching, I should not have known that the mushroom was the genesis of defendants' characteristic figures and colors. The test is to ascertain the effect upon the ordinary everyday person who would buy this sort of an article.

I think that the complainant is not entitled to the exclusive use of the cylindrical form, because obviously that is a proper and natural form in which to inclose the cone-shaped flycatcher material. The division into three spaces on the cylinder is a negligible matter, and no one would ever think of it except as a point of controversy in a lawsuit.

I see no confusion between the names "Pyramid" and "Spiralette," except after very close and deliberate analysis. "Spiralette" was a natural arbitrary name in view of the spiral shape of the material, and nowhere in the record is there anything to indicate that this name was deliberately selected in order to simulate in sound or appearance the name "Pyramid."

[4] There is a good deal which one might guess about, but cases must be decided on evidence, and I am unable to find any evidence which satisfies me or allows me to draw a fair inference that defendants have intended to copy complainant's article for purposes of unfair competition. But motive, while often a valuable index to, is not an essential element of, unfair competition. Louis Dejonge & Co. were first in the field, and they are entitled to the protection of a court of equity against any invasion which constitutes unfair trade. I am of opinion that their rights have been invaded in regard to the red, white, and blue hanger and the "First in the Fight" poster. Further, I see no reason why, in fairness, the defendants cannot put on their article the name of the manufacturer or the sales agent or, in any event, something to indicate that "Spiralette" does not come from the house of Louis Dejonge & Co. The point is that, assuming the form and size of the cylindrical shape and the base to be available to any one, care must be taken in a small article of this kind to avoid creating the impression on the public that the competing article comes from the same source as the original article; and it has often been said that it is extremely easy for a fair merchant to make such changes as fair trading requires. Besides, I see nothing in the testimony of Moebius which presents a good business reason for not putting on the name of the source of manufacture or sale.

I think this controversy is within very narrow limits, and if defendants are well intentioned, as they earnestly assert they are, then the difference can be ended: (a) By defendants adopting a hanger of a single color; (b) by ceasing the use of the "First in the Fight" poster or any-

thing similar thereto; and (c) by either putting on their label the name of the manufacturer or agent or some legend indicating that the article does not come from complainant. If these requirements are complied with, they may retain the name "Spiralette" and the appearance and dressing in other respects in which their flycatcher has been marketed.

There will be a decree in suit No. 2, with costs in accordance with this opinion.