[S. F. No. 13625.   In Bank.—August 1, 1932.]

AMERICAN AUTOMOBILE ASSOCIATION (a Corporation) et al., Appellants, v. AMERICAN AUTOMOBILE OWNERS ASSOCIATION (a Corporation) et al., Respondents.

G. E. Sandford for Appellants.

Hugh L. Smith, Chas. J. Wiseman and Arthur V. Kaufman for Respondents.

THE COURT.—Plaintiff corporations, American Automobile Association and California State Automobile Association, appeal from a judgment denying their application to enjoin defendant corporation from doing business under its corporate name, American Automobile Owners Association, and from using and displaying its official emblem, on the ground that said name is so similar to the name of the American Automobile Association, and its emblem so closely resembles the emblem of the California State Automobile Association as to tend to deceive and mislead.

The California State Automobile Association was incorporated in this state in 1907 as a nonstock corporation, with its principal place of business in the city of San Francisco. Its objects, as stated in its articles of incorporation, are to promote improvement of the highways, encourage proper highway maintenance, accomplish proper marking of the highways, urge just and rational highway legislation, further all good road projects, and protect the interests of its members. At the time of the trial said association had a membership of more than 68,000. In consideration of annual dues, it furnishes its members with towing service, either directly, by towing cars operated by it, or through privately owned garages, and also gives them emergency road service in changing tires and repairing minor mechanical defects. It obtains extensive road and touring information for the benefit of members; supplies them with maps; designates official hotels and garages, which are required to maintain a certain standard; assists members arrested for traffic violations, and otherwise renders services in line with its objects. Its activities in marking the highways of northern California with road signs are well known. It

maintains a separate insurance bureau, which issues certain types of automobile insurance, and it acts as a broker in placing public liability insurance for its members.

Under an arrangement of years' standing with the Automobile Club of Southern California, the appellant California State Automobile Association is not active in the thirteen southern counties of the state. It does not solicit members in said counties, nor does it accept members who reside in southern California without first advising that they join the Automobile Club of Southern California. By agreement between the two organizations, members of the State Association are entitled to the services of the Automobile Club when in southern California, and members of the southern club have reciprocal privileges when in northern California.

The California State Automobile Association and similar associations in all but a few states are members of, or affiliated with, the appellant American Automobile Association, which was incorporated in Connecticut in 1910 as a nonstock corporation, and had existed prior to that time, since 1902, as an unincorporated association. The American Automobile Association is generally known as the ''AAA'', and local organizations affiliated with it as ''AAA'', or ''Three A'' clubs or associations. Members of the California State Automobile Association when traveling outside California are entitled to receive from the organization affiliated with the American Automobile Association in the territory where they are traveling such services as said affiliate association renders to its own members. The California Association in turn accords similar privileges to members of other state associations affiliated with the American Automobile Association when they travel in the territory of the California association. The AAA in this phase of its organization is a centralizing agency through which automobile owners, by membership in a state club affiliated with the AAA, may secure the services rendered by automobile clubs throughout the country. The AAA promotes and facilitates the organization of local associations. Not more than one local organization in any given territory is permitted to affiliate with the AAA. A portion of the annual dues of each member of the state associations is remitted to the AAA, which maintains offices in New York, Washington, D. C., and Detroit. The AAA also carries

on national activities to secure constructive automobile legislation and promote the maintenance, construction and improvement of highways, and disseminates touring information. Individuals, as well as organizations, may join the AAA directly, but it does not solicit or accept members in the territory of a local association affiliated with it. The Automobile Club of Southern California is not a member of the AAA. The AAA does not maintain an office in southern California, nor engage in business there. However, it accepts voluntary applications from persons residing in the southern territory and has a number of individual members there.

The respondent American Automobile Owners Association was incorporated in this state in January, 1924, but did not commence doing business until August, 1926. Unlike the California State Automobile Association and the American Automobile Association, it is a stock corporation. It is in no way affiliated with either the State Association or the AAA. In actual operation the corporation furnishes similar services to those rendered by the California State Automobile Association and automobile associations generally. At the time of trial in November, 1927, its membership had grown to 17,000. It asserts that its activities are confined to the thirteen southern counties of the state. Its principal place of business is in the city of Los Angeles. It also maintains an office in San Diego.

Both the appellant California State Automobile Association and respondent American Automobile Owners Association issue to their members a diamond-shaped enameled metal emblem for display on their automobiles. The official emblems of the respective associations are also prominently featured on their stationery and advertising matter, and on maps and road information distributed to members. The emblem of the parent organization, AAA, is wholly dissimilar to the other emblems. On the California State Automobile Association emblem the dark blue letters AAA are a distinctive type and are inclosed in two large interlocking blue circles resembling automobile tires, arranged so that the outer letters are encircled once and the middle letter is doubly encircled by said two tire-shaped circles. The blue letters stand out conspicuously on a field of orange yellow. The legend California State Automobile Association in small

lettering, approximately a quarter of an inch high, appears on the half-inch blue border of the diamond. The AAA on the emblem signifies that the California State Automobile Association is affiliated with the American Automobile Association. This practice of making the letters AAA the central feature of the insignia is followed by the state associations throughout the country which are affiliated with the American Automobile Association.

The emblem of the American Automobile Owners Association is also diamond shaped, with two corners of the diamond stubbed or truncated, and approximately of the size of the State Association emblem. The State Association emblem has the blue letters AAA inclosed in interlocking blue circles resembling automobile tires upon a yellow background, while the emblem of the American Automobile Owners Association has the white letters AAOA on a red background. The two middle letters AO are of the same height, and are the largest of the group, the O being oblong in form. Said letters AO stand out conspicuously in said group. The AAOA emblem also has a blue border of the same width as the State Automobile Association emblem, and on the border of said AAOA emblem are stamped the words "American Automobile Owners Association". Upon the emblems of both the State Association and the American Automobile Owners Association the smaller letters stating the name of the association are nickel-colored.

Previous to the adoption of its present emblem the American Automobile Owners Association, from the time it commenced doing business in August, 1926, until November, 1926, distributed an emblem which differed in design from the present emblem only in that instead of the letters AAOA, it bore the letters AA, in line, but widely separated, with the word "owners" in lettering less than a quarter of an inch high written underneath, and the third A appearing below the word "owners". Viewed at a distance of twenty feet the word "owners" is not visible, and the three A's appearing in triangular form are quite outstanding. The use of said emblem was discontinued in November, 1926, but the court in the present action nevertheless enjoined its use.

We may observe that although the officials of respondent AAOA testified, and the court found upon the

evidence before it, that the AAOA did not extend its activities beyond the thirteen southern counties of California, there is no such limitation in its articles of incorporation. If the emblems are so similar as to fall under the ban of unfair competition, we do not think that it would be a defense to the suit for injunction to answer that the respondent AAOA had not at the time of trial, as found by the court, extended its activities into northern California. Upon argument before us it admitted that it had since established an office in San Francisco.

The important question presented by the appeal must be determined by an application of the well-established test, which no doubt the trial court applied to the case, to wit: Would a person exercising that care, caution and power of perception which the public may be expected to exercise in the matter which it has in mind, mistake one of said emblems for the other? The only points of similarity are to be found in the size and diamond shape (waiving the difference which exists as to the fact that all of the points of the diamond design of plaintiff California State Automobile Association are pointed, and two of said points of the diamond design of respondent are truncated), and in the small blue border, and in the similarity as to metal color of the smaller lettering on the border. In all other respects they are different as to name, abbreviations, size and style of letters, design of motto and color. Placed at any point within the distance of visual discernment they present an entirely different picture which could not deceive a person of normal discernment into the error of mistaking one for the other. No claim is made as to the right of monopoly by reason of copyright or trademark of the letters AAA, or as to the exclusive right of appellants to appropriate the words ''American Automobile'', for the reason that these words are in common use and are regarded by the law as common property, which may be used by others in combination with other descriptive words, provided they are not used in combination with such other words or symbols or designs as to render it probable that they would mislead persons possessing ordinary powers of perception. Generic terms and words descriptive of place are not subject to exclusive appropriation. No legal objection could be urged against the formation of an association to be known

as the American Automobile Association of South America, or the American Automobile and Motor Association, as such. That neither could impinge upon the AAA symbol adopted and used by the American Automobile Association is clear for the sufficient reason that said three letters in combination had previously been adopted by the American Automobile Association as its symbol. The fact that said letters do not correctly initial the true name of either of said other associations would be an additional circumstance against a claim of right.

No claim of exclusive appropriation of diamond-shaped labels can be sustained, because diamond-shaped designs have been in use for many years and are commonly used in magazine, periodical, label and sticker forms of advertising.

Justice Brewer, in *Lorillard* v. *Peper*, 86 Fed. 956, 960, in giving consideration to the rule which should guide courts in determining whether there exists in fact such a similarity of names, letters, symbols, forms, colors, shapes and sizes as would be likely to deceive a person of ordinary discernment, reduces the subject to the following formula:

"The difference [labels] is such that the eye will take it in at a moment's glance. Summing it all up, while there are certain minor points of resemblance which have been forcibly urged upon our attention, . . . their labels, taking the *tout ensemble,* it appears to us clear that they are so essentially different that no one of ordinary intelligence, desiring to buy the one kind of tobacco, would be misled into buying a package of the other. . . . We cannot surrender our own judgment in this matter because others may be of a different opinion, or because it happens, in isolated instances, that some purchaser was so careless as not to detect the differences. It may well be that, where many sales were made, some individuals, not particularly attentive, may have purchased the defendant's supposing they were purchasing the plaintiff's package. Such things will happen in the ordinary course of business, no matter how great the differences; and the fact that they do happen, while it is not to be ignored, is not to outweigh the evidence which comes from a personal inspection of the packages and labels."

The question here presented is by no means a novel one in the judicature of our federal courts, or of the courts of this state and sister states. The law has many times been considered in its application to wide and diversified subjects of mental and manual production, manufacture, industry, business and trade. The rule has been most frequently applied in controversies arising between publishers of magazines and periodicals, compounders of patent medicines and chewing gums, and candy manufacturers, where the claim of unfair competition has been made the issue. In *Collegiate World Pub. Co.* v. *Du Pont*, 14 Fed. (2d) 158, plaintiff was the publisher of a publication entitled ''College Humor'', and defendant subsequently began the publication of a magazine entitled ''College Comics''. Both publications occupied the same field. The general dress and size of the two publications were strikingly similar. This case has a special bearing on the instant case, inasmuch as it makes reference to a new enterprise entering the field of competition, and the confusion which, if created in the minds of inattentive or careless persons, could at best be but short-lived, and would soon disappear, if it seriously existed. The instant case does not in all respects resemble cases dealing with chewing gums and prepared articles for consumption, which are often hurriedly purchased by the traveling public in small packages and consumed before the deception is discovered, but the transaction of the kind of business in which the respondent is engaged is attended with deliberate action and possible investigation, and above all it is a business in which a good name for square dealing with the public is absolutely essential to success and continuance in business. The relationship between its members and the association is necessarily one of trust and confidence. It is also a business in which fraud or deception are certain sooner or later of detection if either is practiced. No doubt the trial court in considering the rationale of the situation encountered difficulty in bringing itself to understand how a membership consisting of 17,000 persons, or any considerable portion of that number, if obtained by the practice of fraud or deception, could have been induced to retain membership therein after it became known to them that they had been tricked into becoming members of respondent organization.

The depositions of the five witnesses offered to establish the claim of fraud will later receive attention.

The court in the case of *Collegiate World Pub. Co.* v. *Du Pont, supra,* in considering the question as to the likelihood of the name of one magazine being mistaken for the other, said:

"There was some confusion, but it was due to the carelessness or inattention of dealers and purchasers who did not know a new magazine had come out. Such confusion is to be expected at first, where a new magazine enters the field dealing with the same general subject-matter as a magazine already on the market. This confusion was negligible, and would soon disappear as the reading public came to know there were two magazines dealing with the humorous side of college life. The confusion that existed was due to the fact that plaintiff selected descriptive words for its name.

"Similarity in names of magazines dealing with the same subject is not unusual, but, on the contrary, is quite common, such as Popular Science, Popular Mechanics; Outdoor Life, Outdoor Recreation; Field and Stream, Forest and Stream; Boy's Life, Boy's Magazine; Ladies Home Journal, People's Home Journal; Radio Doings, Radio Digest, Radio World, Radio Age, Radio Progress, Radio News, Radio Broadcast; Motor, The Motor, Motor Transport, Motor Record, Motor World, Motor Age, Motor Life, etc."

To the above a long list of other comparative cases might be added in which similarity of association and corporate names was held not to be in violation of the unfair competition rule. We will cite relatively a few from outside jurisdictions, and three or four from this state. Practically every point made by appellants is covered in these cited cases and the law is applied to analogous situations. In *Choynski* v. *Cohn,* 39 Cal. 501 [2 Am. Rep. 476], it was held that the name Antiquarian Book Store did not vest its author with an exclusive right in said name to the extent that it could enjoin the use of the name Antiquarian Book and Variety Store by its later business rival. (See, also, on this and other kindred points, *Tasty Baking Co.* v. *Tasty Pound Cake Co.,* 32 Fed. (2d) 1009; *Umpqua Broccoli Exchange* v. *Um-Qua Valley Broccoli Growers,* 117 Or. 678 [245 Pac. 324]; *Viavi* v. *Vimedia Co.,* 245 Fed. 289; *Parker Pen Co.* v. *Finstone,* 7 Fed. (2d) 753; *Supreme Lodge*

of *Pythias* v. *Improved Order Knights of Pythias,* 113
Mich. 133 [38 L. R. A. 658, 71 N. W. 470]; *Elgin Butter
Co.* v. *Sands,* 155 Ill. 127 [40 N. E. 616]; *Farmers Loan &
Trust Co.* v. *Farmers Loan & Trust Co. of Kansas,* (Sup.)
1 N. Y. Supp. 44; *Richmond Remedies Co.* v. *Miles Medical
Co.,* 16 Fed. (2d) 598; *Italian Swiss Colony* v. *Italian
Vineyard Co.,* 158 Cal. 252 [32 L. R. A. (N. S.) 439, 110
Pac. 913].)

In this state the question of unfair competition received
critical attention in *Dunston* v. *Los Angeles Van & Storage
Co.,* 165 Cal. 89 [131 Pac. 115, 117], and *Southern California
Fish Co.* v. *White Star Canning Co.,* 45 Cal. App. 426 [187
Pac. 981]. In the Los Angeles Van & Storage case, former
Justice Henshaw gave consideration to the particular ques-
tions presented by the appeal in the instant case. Plaintiff
Dunston established his business in 1896 and gave to it the
name Los Angeles Van, Truck & Storage Co. In 1902 a cer-
tificate was issued to him by the Secretary of State granting
him the sole and exclusive right to use said name. In 1910,
defendants, so the complaint alleged, organized a corporation
for the purpose of conducting a similar business to that of
plaintiff in the city of Los Angeles, and fraudulently appro-
priated a similar name, to wit, Los Angeles Van & Storage
Company. Plaintiff alleged that the name of the company
last named was in imitation of his company's name, and
was selected for the purpose of deceiving, and had deceived,
his patrons and the general public. In disposing adversely
of plaintiff's claim that the trade name was susceptible of
exclusive use, citing section 991 of the Civil Code, the court
says: "It is too apparent to need discussion that the
name here employed by plaintiff has reference in its first
words to the place of business; in the remaining words to
a description of the business. Such names, titles or desig-
nations are not the subject of exclusive copyright or trade
mark." (Citing numerous cases.) The court then points
out that as the judgment cannot be supported upon the
theory of an invasion of an exclusive right to property
in a trademark, the only hope for the judgment must rest
upon the ground of unfair trade dealing. This principle,
says the opinion, will protert the person first in the field
to the extent of making competitors "use reasonable precau-
tions to prevent deceit and fraud upon the public and upon

the business first in the field''. Continuing, the decision reads:

''But, as has been intimated, relief in such cases really rests upon the deceit or fraud which the later comer into the business field is practicing upon the earlier comer and upon the public. Like all other kinds of fraud and deceit this is not presumed but must be pleaded and shown. Since plaintiff had no exclusive property right by way of trademark in the use of the name, it follows that the mere similarity of names does not establish the fraud. It must be such a misuse of the name by advertising and soliciting as amounts to fraud, and without this proof no relief may be granted, for, as is said by the Supreme Court of the United States in [*Delaware & H.*] *Canal Co.* v. *Clark*, 13 Wall. 311 [20 L. Ed. 851] : 'True it may be that the use by a second producer, in describing truthfully his product, of a name or a combination of words already in use by another, may have the effect of causing the public to mistake as to the origin or ownership of the product; but if it is just as true in its application to his goods as it is to those of another who first applied it and who, therefore, claims an exclusive right to use it, there is no legal or moral wrong done. Purchasers may be mistaken, but they are not deceived by false representations, and equity will not enjoin against telling the truth.' The findings absolutely fail to show such fraud, imposition or deceit. Since the use by the defendants of the similar name which they have selected is not forbidden by law, the use of it even for conspicuous advertising, so long as the advertisements are true, is not a violation of any of plaintiff's rights. The fact that confusion to the business of the plaintiff has resulted from acts not in themselves illegitimate, of itself affords no ground for relief.''

The judgment for plaintiff was reversed. In the instant case, as in the case last above cited, the *findings* absolutely fail to show ''fraud, imposition, or deceit''. *Southern California Fish Co.* v. *White Star Canning Co., supra,* is another illuminating case as to what constitutes unfair competition, and answers many of the objections made by appellants. It has to do with the labels and containers used in canning tuna fish products for the market. Without going into detail as to all the points of resemblance and difference as

to cans, labels and emblems used by the rival companies, which are specifically considered in the decision, it is sufficient to make reference to portions of the decision which have application to the principle of law involved in the instant case. It is coincident in the decision that the cans used by the contending fish packers, with their wrappers, bore considerable resemblance to each other, but all of said resemblances arose from features that were common to the trade or business, to which no one had an exclusive right. It is there said that the fact that anyone is deceived by the size and general make-up of the can, or by the prevailing color scheme of the wrapper or labels, does not help plaintiff's case. All of those features were old, separately and in combination. Plaintiff must show deception arising from some feature of its own, not common to the public.

"Passing from the features that are common to the trade—size and shape of cans, color scheme of labels, etc.— we find that, with but one exception, presently to be noted, the label used by defendant is substantially unlike that used by plaintiff. The exception to which we refer is the figure or design of the fish. But the figure of the fish is a symbol that is indicative of the article sold. And the rule is that there can be no exclusive appropriation of a sign or symbol that represents or is descriptive of the article to which it is attached . . . , or which indicates the ingredients of the package, or the mode of composition. To give the right of exclusive appropriation the sign or figure must be some arbitrary form or figure, not suggestive of the nature of the article to which it is affixed." (*Southern California Fish Co.* v. *White Star Canning Co.*, 45 Cal. App. 426, 432 [187 Pac. 981, 984].)

The decisions of this court and courts of other jurisdictions make it plain that the law of unfair competition does not pretend to protect purchasers against falsehoods which salesmen may tell. It does not assume to perform the functions of penal statutes. The law is well stated in *Southern California Fish Co.* v. *White Star Canning Co.*, *supra*, as follows:

" 'The law of unfair competition does not protect purchasers against falsehoods which the tradesmen may tell; the falsehood must be told by the article itself in order to make the rule of unfair competition applicable.' (*Hill*

138

*Bread Co.* v. *Goodrich Baking Co.*, [N. J. Ch.] 89 Atl. 863.) Each of the housewives whose testimony plaintiff relies on to show specific instances of actual deception admitted that, by using her eyes, she could readily detect the difference in the two packages. 'A resemblance which would deceive an expert or a very cautious purchaser may still give a right of action, but a resemblance which would deceive only an indifferent or careless purchaser gives no right of action.' The true rule lies between these extremes, condemning what would be reasonably calculated to deceive the common or usual purchaser of the given article when exercising ordinary care." (See, also, *Howe Scale Co.* v. *Wyckoff*, 198 U. S. 118 at 140 [49 L. Ed. 972, 25 Sup. Ct. Rep. 609, 614].)

Many other cases might be cited to the effect that it is not enough to entitle a complainant to relief that some purchasers might be influenced to accept a competitor's product when his was desired because the competitor's product bore upon the container some figure or words in common with his own, if the differences in other respects are such as to make them readily distinguishable by an ordinarily observant purchaser; nor is it a ground of action that deception was due to resemblance in features as to which the complainant had no exclusive right. (*Wunderlich* v. *Cash*, 33 Fed. (2d) 118.)

Of course, the only rule by which resemblances or differences can be detected is by physical comparison. Placing the objects of disputed similarity side by side is the method adopted by all courts, that not only the size, shapes and forms may be brought into juxtaposition, but also that the color effect will be brought into the picture. There can be no other fair method of arriving at the truth. This is the approved test and the only way by which similitudes and differences may be compared. Whether one emblem resembles another is to be determined by an inspection of the points of difference and resemblance, as a whole, and not merely of points of resemblance. (*Richmond Remedies Co.* v. *Dr. Miles Medical Co.*, 16 Fed. (2d) 598; *Postum Cereal Co.* v. *American etc. Co.*, 119 Fed. 848; *Viavi Co.* v. *Vimedia Co.*, 245 Fed. 289; *Southern California Fish Co.* v. *White Star Canning Co.*, 45 Cal. App. 426 [187 Pac. 981].) When so examined, the emblems of the contending competitors differ in so many conspicuous and essential features—

in name, coloring, number and formation of letters, symbol —that it does not seem possible the one should be mistaken for the other by persons of ordinary intelligence, exercising ordinary care in the concerns of business. The form of the diamond is not absolutely identical. Of course, that is not susceptible of exclusive appropriation. But even should mistakes infrequently occur, the error would be with the person who fails to use his powers of perception in distinguishing differences where they actually exist. The similarity between numerous types of automobiles themselves is more striking than is the similarity between the emblems in the present case.

The court found, in line with the pleadings, that the plaintiff California State Automobile Association had a membership of approximately 68,000 members, and respondent had a membership of approximately 18,000 members at the time of trial, to wit, November, 1927, totaling a membership of 86,000 persons. This number is far from comprising the total number of persons owning or operating automobiles in this state. Appellants, in an effort to prove specific instances of deception claimed to have been practiced by agents employed by respondent in its business, introduced the depositions of four persons taken in their behalf, which are specifically set out in the briefs, from which it is claimed that respondent's representations and emblems influenced them to join respondent association. In one case the transaction was with a housewife. She testified that she joined the respondent association when her intentions were to join the California State Automobile Association, and she believed she was joining it. She claims that she was misled by the three A's. As near as she recollected it, the agent said, as she understood him, that he represented the American Automobile Association. She admitted her membership card made no reference to the California State Automobile Association. Her testimony is clearly so uncertain as to have justified the trial court in holding that her action could not be charged to deception on the part of respondent association. A second deponent averred that he glanced at the application before he signed it, and saw the Three A emblem; that he did not observe the word "owners on the emblem; that the salesman told him that he could only get service from a garage having the official Three A sign;

that the salesman told him to go to appellant's office on K Street in Sacramento for information and maps; that the Three A was all that was talked about. This witness, when asked if he made an examination of the emblem which the person displayed to him, answered, "No, sir, because I know that is the 'Three A.'s', and I don't have to examine." He did not read over a paper which he signed. A third deponent said that a salesman displayed the emblem AAOA, herein described, to him and he joined thinking it was "Three A.'s." He was told he could get service anywhere in the country. A fourth deponent said that the letters AAA on the respondent's emblem indicated to him that it was appellant's emblem. He testified that said salesman represented that his organization was the one that placed the road signs on the highways. The deponent admitted that he was not shown an emblem of the California State Automobile Association, and while he signed a paper which said "make all checks payable to the American Automobile Owners Association", he did not observe the word "owners" on the literature or otherwise.

The deposition of the fifth deponent was practically along the lines of the four herein reviewed. In commenting on this class of evidence in *Moebius* v. *Louis De Jonge Co.*, 215 Fed. 443, 447, the court made the following observation:

"Complainant has introduced testimony as to misrepresentations of salesmen of defendants and confusion and mistakes by purchasers of these two articles. The salesmen are not identified, and, where only sporadic incidents are ascertained, a merchant is not chargeable with an occasional remark of an unidentified occasional salesman.

"Little aid is furnished by the testimony of witnesses as to confusion when that testimony is taken by deposition. In open court the judge can form his opinion of the point of view and mental attitude of the person who gives testimony of this character. There is no reason to doubt that the illustrations given by the witnesses in the case at bar are truthfully stated, and of course in doubtful cases actual instances of confusion may be helpful in arriving at a correct decision; but, generally speaking, the court must, if possible, diagnose the subjective symptoms of the purchasing public from the appearance of the articles themselves, unless

a course of conduct is proved which shows the employment of methods and means indicating unfair competition.''

It is the trial court's function to judge of the sufficiency of the evidence in the case and give it such weight as it finds it entitled to receive.

The appeal is taken from that portion of the judgment rendered in favor of the defendants and against plaintiffs which adjudges that ''It is further ordered, adjudged and decreed that said plaintiffs nor is either of them entitled to any other, further or additional relief whatsoever as against said defendants or either or any of them as prayed for in said complaint, and that said defendants are entitled to recover judgment against said plaintiffs for their costs of suit taxed in the sum of —— Dollars.'' The prayer of the complaint asks for an order of injunction restraining the use of said emblems and insignia by respondents, and for an order restraining respondents ''from doing business under or using or displaying the title and corporate name 'American Automobile Owners Association', or any title or name similar to the respective titles and names of plaintiffs; from distributing to any person any printed or written matter, or erecting any signs containing or bearing said emblems, or corporate title similar to those of plaintiffs; from representing that defendant corporation is in any way connected with or affiliated with either of plaintiffs; from representing that members of defendant corporation will receive any services whatsoever from either of plaintiffs, and for costs and such further relief as may be equitable and just.''

No money judgment was sought by the pleading and no attempt was made to prove money damages.

The court conceded that the California State Automobile Association and its parent corporation had performed a great and valuable service to the traveling public in the ways herein described, but found that their fears as to the deception that would ensue to the public if respondent were permitted to use the emblems and other means of publicity which it had adopted, were unfounded and unsupported by the evidence. The court found squarely upon the issue of fact presented by the pleading, ''that said defendants have adopted said emblems and title for the purpose of so practicing deceit and fraud upon the public and prospective

members are thereby deceived, deluded", etc., by said emblem, and similar allegations, and its finding was in each instance that said allegations were untrue. It also found, upon evidence fully developed, that respondent corporation was not at the time of, or prior to the filing of the complaint herein, in competition with the plaintiffs in the territory in which it solicited and did business, to wit, central and northern California, but that it confined its field of activity and business transactions to the thirteen counties named in the findings. This finding has become obsolete, inasmuch as respondent stated in the hearing before this court that it had since established an office in the city of San Francisco. This being so, the appeal presents the sole question of unfair competition, which issue was really the controlling one passed on by the trial court, for our consideration.

■ Appellants have argued that the evidence in the record would justify or compel a finding that the respondents have been prompted by a bad or evil intent to design their emblems in the manner described. The court has found that they would not deceive an ordinarily careful person, in the manner and form of the law. If that is so, the act is not unlawful. An uncompleted intent is not actionable. In civil law as well as in criminal law there must be a joint operation of act and intent to constitute an unlawful act. If the act is not unlawful, the intent would not make it so. Everyone who enters the field of competition desires and plans to draw custom from his competitors. Unless his acts are unlawful, his avarice is not actionable.

We do not understand that there is any contention on the part of appellants that respondents have ever used the combination of letters AAOA as a separate symbol or emblem. The initial letters have always been a part of the emblems which are before this court as exhibits. In no case are the four letters AAOA inclosed in circles resembling automobile tires, as is the case with the California State Automobile Association, and there can be no contention that the American Automobile Association's emblem in any respect resembles the respondent's emblem in form, or color, or shape, or size. The question presented is one of fact. This court is not permitted to substitute its judg-

ment for that of the trial court where, as here, there is substantial evidence to support the trial court's judgment. The judgment appealed from is affirmed.

Rehearing denied.

Curtis, J., and Preston, J., dissented.