**JOYCE, Inc., v. FERN SHOE CO. et al.**
**No. 661–M.**

District Court, S. D. California, Central Division.
April 11, 1940.

Herbert A. Huebner, of Los Angeles, Cal., for plaintiff.

Harris, Kiech, Foster & Harris, and Ward D. Foster, all of Los Angeles, Cal., for defendants.

YANKWICH, District Judge.

The suit was begun on November 14, 1939, and charged infringement of Letters Patent No. 2,067,963, relating to shoes, and unfair competition arising out of the infringement complained of.

It sought injunction, accounting, and damages suffered by the infringement and the unfair competition.

On January 5, 1940, and while the matter was pending before another judge of this court, *on stipulation of counsel,* it was

referred to the Honorable Charles C. Montgomery as master.

The conditions of the reference were these: "It Is Ordered that this cause be referred to Charles C. Montgomery, Esq., as Special Master to take and hear the evidence offered by the respective parties and to make his findings and conclusions on *all issues presented and recommend the judgment to be entered thereon;* the Special Master is authorized and empowered to do all things and to make such orders as may be required to accomplish a full hearing on all matters of fact and law in issue in this case. The Special Master is directed to commence the trial hereof on or about January 10, 1940, and to proceed promptly with the same; counsel for both parties will exchange and file briefs within three days after the close of the trial; the Special Master will hand counsel his draft report within five days after receiving the briefs; counsel for the parties will submit to the Special Master any suggestions or exceptions to the draft report within two days after receiving the same; and the Special Master will file his final report within five days after receiving the suggestions or exceptions of counsel to the draft report. It is noted that while the parties have consented to the reference, *they do not stipulate that the Master's findings of fact shall be final, and reserve leave to file exceptions thereto."* (Italics added.)

The master began the hearing of the matter on January 10, 1940. Testimony was taken on various days between that day and February 8, 1940, when the parties rested. Extended briefs were filed and the matter was submitted to the master, who filed his report on March 4, 1940.

On March 12, 1940, the cause was transferred to me. On March 11, 1940, the defendant filed its objections to the report of the special master. They were duly noticed, and came up for hearing before me on March 25, 1940.

The patent in issue was before me in Joyce, Inc., v. Solnit, D.C.Cal.1939, 29 F. Supp. 787, 43 U.S.P.Q. 233. In substance, I there held that the four claims of the patent were valid, although not infringed by the accused structures there involved. In reaching this conclusion, I held that the elements of the combination in the Joyce patent, which constituted its contribution to the prior art, were a midsole member therein described and a covering over it.

The accused devices there did not have these two elements.

The decision did not require any discussion of the construction of the midsole member.

In the present case, the accused structures all contain midsole members constructed in different manners. Thus, in Defendant's Exhibit 1, the midsole is of two component parts, a felt half-platform tread and a heel lift made of cork. In another accused structure, Defendant's Exhibit 2, the midsole is formed by a rand running around the toe to the shank of the shoe on both sides which creates a hollow, which is filled with a plastic composition of ground cork. The master found that neither Exhibit 1 nor 2 infringed Claims 1, 2 and 3 of the patent, but that they infringed Claim 4.

This claim reads: "4. In a slipper construction, an upper, the lower edges of which are turned inwardly and secured to an insole, a midsole member of relatively thick cushioning material shaped to extend completely over the surface of said insole and comprising a sole portion of substantially constant thickness and a heel lift portion tapering in thickness toward the shank of the slipper to provide a substantially smooth lower surface to said midsole member, a covering of relatively thin material extending about the edges of said midsole member, means for securing the upper surface only of said midsole member to the insole, and an outsole member co-extensive with said midsole member and attached solely to the lower surface of said midsole member."

The elements of this combination are: (1) an upper portion of a shoe fastened to (2) an insole, (3) a midsole of thick cushioning material, with (4) built-in heel lift which is covered about the edges as a single element, (5) means for fastening the upper portion of the midsole to the insole and (6) an outsole attached to the lower surface of the midsole.

The result is a shoe which, while having a flat outer sole, has the proper arching and the benefit of a cushioned sole. The midsole, by the unity of its construction, lends itself, as does the heel lift, because of its conformity to the arch form of the shoe, to decorative treatment not ordinarily possible with shoes built along ordinary patterns.

My prior decision limited the claims to the structure particularly described in the

patent. It *did not attempt* to lay down any definite rules as to midsoles which *might* or *might not* be held to infringe the claims. All that I there held was that the wedge-type laminated form of heel lift consisting of a plurality of sheet-form heel lift units secured together was a mere deviation from the wedge-type shoe long known to the art, and did not infringe.

■ More particularly, I held that the accused structure lacked two essential elements: a midsole member and a unit covering over it. There is nothing in that decision which stands in the way of the finding of the master here that a midsole member formed, either by combining a felt half-platform made of cork with a heel lift and combining them into substantially constant thickness, through beveling and overlapping, as is done in Defendant's Exhibit 1, or by a rand running around the toe to the shank of the shoe on both sides creating a hollow filled with a plastic combination of ground cork, as in Defendant's Exhibit 2 does infringe.

■ We would be discouraging instead of promoting invention (U.S.Constitution, Article I, Sec. 8, Subdivision 8) if, in a structure or device patent, we permitted a deviation from the method of construction of an important element of a combination either by joinder or splitting of elements, to destroy a contribution to the art which, limited though it be, is yet entitled to protection. See Art Metal Works, Inc. v. Abraham & Straus, 2 Cir., 1939, 107 F. 2d 940.

■ Infringement is not avoided by dividing parts of a combination or by integrating them. See Howard v. Detroit Stove Works, 1893, 150 U.S. 164, 14 S.Ct. 68, 37 L.Ed. 1039; Standard Caster & Wheel Co. v. Caster Socket Co., 6 Cir., 1901, 113 F. 162; General Electric v. Yost Electric, 2 Cir., 1905, 139 F. 568; D'Arcy v. Staples & Hanford Co., 6 Cir., 1908, 161 F. 733; In re Prinzler, Cust. & Pat. App., 1938, 97 F.2d 102; Kay Jewelry Co. v. Gruen National Watch Case Co., 6 Cir., 1930, 40 F.2d 600. More so, when carried into practice, it has met with great success, to which those in the same competitive field have paid the compliment of slavish imitation. I am of the view that the accused structures just described and the one which was Defendant's Exhibit 5 and each of them, infringe Claim 4 of the patent in suit.

An extensive prior art has been argued and re-argued with great fullness in this case. It would serve no useful purpose to consider it in detail. Much of it was before me in Joyce, Inc., v. Solnit, D.C.Cal. 1939, 29 F.Supp. 787, although I did not discuss it there with particularity. Nor shall I do so here. However, to show non-infringement, the defendants have presented, *as exhibits,* two charts aiming to illustrate the best references as to each of the two accused exhibits, 1 and 2, and show their indebtedness to them.

We advert to these briefly.

As to Exhibit 1, the references are Efflandt 376,183, January 10, 1888, and Gilkerson, 1,751,990, March 25, 1930. Both were references in Joyce, Inc., v. Solnit, supra. But neither shows the characteristics of the Joyce shoe or the essence of its contribution to the art,—a visible midsole, encased as a unit, *which the accused structure also has.*

Efflandt aims to apply to a boot or shoe "a compound sole composed of a wooden sole, thin, and, therefore, flexible in the shank and a leather inclosing rim, together with which it is introduced between the insole or the welt and the ordinary leather outer sole of the boot or shoe for the purpose of producing a water-tight or warm covering of the foot."

He does not claim originality for the use of the wooden intermediate sole.

In fact, in his specifications, he says: "The application of wooden intermediate soles is well-known". But he claims novelty in the "peculiar manner of fastening" which allows the leather to be replaced without removing the wooden sole.

The shoe has the regular arch and heel. The wooden sole is not cushioned or flexible. It is not secured to the upper. We have no heel lift with a beveled or tapered upper face. Nor does the wooden sole conform to the natural shape of the arch of the foot.

Gilkerson, which was also a reference in Joyce, Inc., v. Solnit, supra, aims "to provide a cushion spring heel construction for Goodyear welt shoes having sewed heel seats which may be expeditiously incorporated in shoes of this type without any change in the factory equipment and which does not materially increase the cost of the shoe."

404

He gives as his further object "to provide a combined cushion heel and flexible shank construction for Goodyear welt shoes having sewed heeled seats".

The chief aim of this construction is to secure a spring heel. The rubber piece around the spring heel portion does not fold over the upper or lower edge of it. The welt is the usual one, is comparatively thick and does not correspond to the encasement in the Joyce midsole, *and the accused specimen.*

The best references given for Exhibit 2 are Brooks 152,067, June 16, 1874, and Rounds, 1,245,802, November 6, 1917.

Brooks aims "to furnish improved cork-sole boots and shoes which shall prevent the heat from passing from the feet in winter and to the feet in summer, which will keep out the dampness, will be very light in comparison with the thickness of sole and may be repaired with the same facility as ordinary boots and shoes."

He claims as invention "the upper, the inner and middle sole, the two layers of cork, combined with each other and secured by two seams, and in the combination of the sole-leather band and its leather cover with the upper, the inner and middle sole, the two layers of cork and the welt to which the sole is sewed".

This shoe is not flat. It does not have the midsole or the covering, which I have held to be main characteristics of the Joyce combination and *which the accused device has.* Brooks teaches that you may modify the regular welt shoe by putting a wedge under the front part of the sole instead of at the heel.

Rounds is merely a wedge-type shoe. The inventor states as his object "to provide a shoe having such a continuous comparatively flat shoe and the usual upper, while at the same time bringing the foot of the wearer into the position to which he is accustomed in the wearing of shoes provided with heels."

He accomplishes this object "by providing a tapered insert between the sole and insole, thus raising the heel of the wearer from the sole."

He merely gives a variant of the wedge-heel lift. The shoe lacks the distinct enclosed midsole of Joyce, *and the accused device.*

None of these inventions anticipated Joyce. None reads on Claim 4. *Both accused devices do.*

The other prior art need not be discussed in detail.

Hence my agreement with the conclusion of the master that the four Joyce claims, as interpreted by me in Joyce, Inc., v. Solnit, supra,—an interpretation which the master has followed and amplified here,— are valid, and that the defendants infringe.[1]

---

**1** [4] In what precedes, I have discussed the most fundamental grounds upon which infringement rests. I have not endeavored to cover the additional grounds contained in the master's detailed report or to answer all the specific objections urged by the defendants against the findings of the master. When, *on stipulation of counsel,* a master is used, and his findings are full and supplemented by his reasonings, including a discussion of the prior art, which is urged against his conclusions, it would destroy the entire purpose of the reference if the judge were required, in addition to examining the record upon which the conclusion is based, to indicate, *in a lengthy opinion,* all his grounds for adhering to the report.

Personally, I discountenance the use of masters except in case of emergency and *when the request comes from the litigants.* But I believe that the spirit of the new rules which dispenses even with the necessity of findings by the court when we agree with the master's conclusions, Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, calls for a full statement of our views only as to the matters on which we disagree.

In what precedes I have done this. In addition, I have indicated my reasons for agreeing with the master's interpretation of the claims. As it is, what began as a memorandum has turned into a good-sized opinion.

▉ I favor the writing of opinions to indicate the grounds for decision.

But I do not consider them *obligatory, even in patent cases.* If they were required, even after a detailed and reasoned master's report, the task would be repetitious and become irksome.

Knowing the earnestness of counsel, I make this statement to obviate any claim that the court did not consider seriatim the twenty objections urged to the findings, *to which a new 109 page brief and two hours of oral argument before the court was directed by counsel for the defendants, in addition to the 196 page brief filed before the master, which embodied substantially the same views.*

All objections and arguments were considered, although I do not find it necessary or advisable to discuss them all.

■ I am also of the view that, through their simulation of material, color scheme, form and appearance in Defendant's Exhibits 1, 2, 5, and 5A, the defendants have been guilty of that unfair competition tantamount to fraud *which courts condemn.* See 63 Cor.Jur. 393; Singer Manufacturing Co. v. June Manufacturing Co., 1896, 163 U.S. 169, 184, 16 S.Ct. 1002, 41 L.Ed. 118; Howe Scale Company v. Wycoff, Seamans & Benedict, 1905, 198 U.S. 118, 134, 25 S.Ct. 609, 49 L.Ed. 972; Merriam & Co. v. Saalfield, 6 Cir., 1912, 198 F. 369; Rice & Hutchins, Inc. v. Vera Shoe Co., Inc., 2 Cir., 1923, 290 F. 124; General Baking Company v. Gorman, 1 Cir., 1925, 3 F.2d 891; Federal Trade Commission v. Algoma, 1934, 291 U.S. 67, 81, 54 S.Ct. 315, 78 L. Ed. 655; Virginia Art Goods Studios v. Goldberg et al., 2 Cir., 1935, 76 F.2d 122; Hanna Mfg. Company v. Hillerich & Bradsby Co., 5 Cir., 1935, 78 F.2d 763, 101 A. L.R. 484; Enders Razor Company v. Christy Company, 6 Cir., 1936, 85 F.2d 195; Brooks v. Great Atlantic & Pacific Tea Company, 9 Cir., 1937, 92 F.2d 794; Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 1938, 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195.

The master found that Defendant's Exhibits 26 and 27 did not infringe any of the claims of the Joyce patent, because they *did not* contain a midsole member which covered the entire length of the shoe, and were constructed according to the Aranov application.

But I cannot concur in his finding that the defendants, by manufacturing these two structures, are guilty of unfair competition.

■ The Exhibits in evidence show that the only similarity between these shoes and the plaintiff's are the use on the midsole member of colors contrasting with the remainder of the shoe. Unfair competition may exist although there be no infringement. See William R. Warner & Co. v. Eli Lilly & Co., 1924, 265 U.S. 526, 44 S. Ct. 615, 68 L.Ed. 1161; Chesebrough Mfg. Co. v. Old Gold Chemical Co., Inc., 6 Cir., 1934, 70 F.2d 383. But, under the guise of unfair competition, we should not grant to a person a *perpetual* monopoly which, for lack of invention, he is denied under patent law *for a limited time.* Unless the imitation is of structure, form, material, and the like, and is so slavish as to tend inevitably to deceive the average buyer, *(and this is the case with Exhibits 1 and 2)* we should not allow a mere design, *through contrast of color,* to become a monopoly. If this were so, the form in which a design is cast, by its very functional nature, and which is not protected by patent law, would give rise to a *more extensive* monopoly.

As said by the court in Pope Automatic Merchandising Company v. McCrum-Howell Co., 7 Cir., 1911, 191 F. 979, 981, 40 L. R.A.,N.S., 463: "Development in a useful art is ordinarily toward effectiveness of operation and simplicity of form. Carriages, bicycles, automobiles, and many other things from diversity have approached uniformity through the utilitarian impulse. If one manufacturer should make an advance in effectiveness of operation, or in simplicity of form, or in utility of color; and if that advance did not entitle him to a monopoly by means of a machine or a process or a product or a design patent; and if by means of unfair trade suits he could shut out other manufacturers who plainly intended to share in the benefits of the unpatented utilities and in the trade that has been built up thereon, but who used on their products conspicuous name-plates containing unmistakably distinct trade-names, trade-marks, and names and addresses of makers, and in relation to whose products no instance of deception had occurred—he would be given gratuitously a monopoly more effective than that of the unobtainable patent in the ratio of eternity to 17 years."

And see Cheney Bros. v. Doris Silk Corp., 2 Cir., 1929, 35 F.2d 279; Millinery Creators' Guild v. Federal Trade Commission, 2 Cir., 1940, 109 F.2d 175; Kellogg Co. v. National Biscuit Co., 1938, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73; Steam-Electric Corp. v. Herzfeld-Phillipson & Co., D.C.Wis., 1939, 29 F.Supp. 1011.

To do this here would mean that no shoes could ever be manufactured in which an element resembling the Joyce midsole,— without patterning it so as to infringe,— should be made to contrast in color, with the upper. Joyce is not entitled to a monopoly of this character.

■ I question that "Cool-ees" and "Sunees" are sufficiently similar to warrant the conclusion that the latter, in itself, leads to deception.

They certainly are not, if we bear in mind some of the recent instances in which similarity has been denied. Thus, "rubroid" as against "rubbro", as applied to a rubber-like substance (Standard Paint Co. v. Trinidad Asphalt Co., 1911, 220 U.S. 446,

31 S.Ct. 456, 55 L.Ed. 536); "steam-o-matic" as against "steam-electric", as applied to electrical steaming irons (Steem-Electric Corp. v. Herzfeld-Phillipson Co., supra); "vapex" as against "vaporub", as applied to a cold remedy (Vick Chemical Co. v. Thomas Kerfoot & Co., Cust. & Pat.App., 1935, 80 F.2d 73); "popular mechanics" as against "modern mechanics" as the name of a publication (Fawcett Publications v. Popular Mechanics Co., 3 Cir., 1935, 80 F. 2d 194); the use of "Whitecross" on medical preparations (Wunderlich v. Cash, 5 Cir., 1929, 33 F.2d 118); "American Automobile Association" against "American Automobile Owners Association" (American Automobile Association v. American Automobile Owners' Association, 1932, 216 Cal. 125, 13 P.2d 707, 83 A.L.R. 699; "Fidelity appraisal company" against "Federal appraisal company" (Fidelity Appraisal Company v. Federal Appraisal Company, 1933, 217 Cal. 307, 18 P.2d 950).

■ It is true that, regardless of trademark rights, even a geographic or proper name may, by long use, become so associated with a concern or product as to warrant court interdiction of its use by others. See Phillips v. Governor & Co., etc., 9 Cir., 1935, 79 F.2d 971. But I do not believe that the coined word "sun-ees" necessarily results in confusion with "cool-ees", especially when the former is used in the phrase "Sun-ees by Ferncraft."

I am, therefore, of opinion that Exhibits 1 and 2 contain such elements of slavish imitations of shape, kind and color of material, and the like, as to have a direct tendency to confound and mislead the public, and to amount to fraud, despite the defendants' marking on the sole of the shoe.

But I am of the view that the mere use of contrasting colors in the shoes manufactured by the defendants, as a licensee under the Aranov application for patent, is not unfair competition.

In view of the conclusion of non-infringement reached as to the Aranov structures, the defendants challenge our right to determine the question of unfair competition as to these structures.

The plaintiffs seek the protection of a patented article. The facts out of which the charged infringement and the unfair competition arise are the same. We are, therefore, dealing with *one claim, stated in two counts.*

■ And, in the light of recent cases, the court may pass on the unfair competition phase, even after it determines that there was no infringement. See Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148; Armstrong Paint & Varnish Co. v. Nu-Enamel Corp., 1938, 305 U.S. 315, 59 S.Ct. 191, 83 S.Ct. 195; Lewis v. Vendome Bags, 2 Cir., 1939, 108 F. 2d 16.

The findings of the master contain forty-seven paragraphs. The conclusions, twelve paragraphs. As the findings are interrelated, it was not possible for the defendants to designate the particular paragraphs to which their attack is directed. So, in ruling upon the objections, we cannot follow the usual custom of overruling the particular objections by number. Rather do we follow a composite system by designating the findings and conclusions approved, in the light of the reasons just given.

Hence the ruling:

The court, having considered the report of the master and the objections of the defendants thereto, and the transcript of the oral testimony in the case, and the documentary evidence and physical exhibits received, and the briefs filed before the master and the additional oral arguments and briefs had before the court upon the hearing of the objections, finds as follows:

The court confirms the findings of the master as to paragraphs 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 37, 38, 39, as conditioned by the succeeding ruling, 40, 41, 42, 43, 44, 45, 46 and 47 and adopts said findings as its own.

The objections of the defendants to the same and each of them are overruled.

The court rejects the findings of the master contained in paragraph 36 and in paragraph 39, so far as it may apply to Defendant's Exhibits 26 and 27, and sustains the defendants' objections thereto. The court orders new findings to be prepared, *on this subject only,* in accordance with the views here expressed.

The court approves the master's conclusions 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, and 12.

The court rejects Conclusion 11 relating to unfair competition under the Aranov patent application and orders a new con-

clusion drawn in accordance with the views expressed here.

And the court orders an interlocutory judgment and reference in accordance with the conclusions herein announced to the Honorable Charles C. Montgomery, as master, for the purpose of determining the damages, *if any*, suffered by the plaintiffs by reason of the infringement and unfair competition.